**AKRON CENTER FOR REPRODUCTIVE HEALTH, INC., et al., Plaintiffs-Appellants, Cross-Appellees,**

**v.**

**CITY OF AKRON, et al., Defendants-Appellees, Cross-Appellants,**

**Francois Seguin, et al., Intervenors Defendants-Appellants.**

**Nos. 79–3700, 79–3701 and 79–3757.**

United States Court of Appeals, Sixth Circuit.

Argued Oct. 23, 1980.

Decided June 12, 1981.

Rehearing Denied July 10, 1981.

Petition for Rehearing of Intervenors Denied July 22, 1981.

Stephan A. Landsman, Cleveland-Marshall College of Law, Cleveland State University, Cleveland, Ohio, Gordon J. Beggs, ACLU of Cleveland Foundation, Cleveland, Ohio, for plaintiffs-appellants, cross-appellees.

Dennis Haines, Youngstown, Ohio, Patricia A. Vance, Akron, Ohio, Janet Benshoof, American Civil Liberties Union, Reproductive Freedom Project, New York City, Robert P. App, Bruce A. Campbell, American Civil Liberties Union of Ohio Foundation, Inc., Columbus, Ohio, for plaintiffs-appellants, cross-appellees.

Alan G. Segedy, Segedy & Umbaugh, David G. Umbaugh, Akron, Ohio, for Sequin and Black.

James L. Bickett, Cuyahoga Falls, Ohio, Robert D. Pritt, Akron, Ohio, Robert A. Destro, Milwaukee, Wis., for City of Akron, et al.

Dara Klassel, Planned Parenthood-World Population, Harriet F. Pilpel, New York City, Nadine Taub for American Pub. Health Association, Rutgers University School of Law, Women's Rights Litigation Clinic, Newark, N. J., for amicus curiae Planned Parenthood Federation of America, et al.

Before LIVELY and KENNEDY, Circuit Judges, and GIBSON,* District Judge.

LIVELY, Circuit Judge.

These consolidated appeals seek review of various holdings of the district court in an action challenging the constitutionality of an ordinance of the City of Akron, Ohio which regulates abortions. By its terms the ordinance was to become effective May 1, 1978, and the present suit was filed in the district court on April 19, 1978. The plaintiffs are three Ohio corporations that operate out-patient abortion clinics in Akron and a physician who has performed abortions at one of the clinics. The defendants are the City of Akron, its mayor and director of public health and the police prosecutor of Akron. The district court permitted participation as defendants by a group of intervenors "solely in their independent capacity as parents of unmarried minor daughters of child-bearing age."

## I. The District Court Opinion

The opinion of the district court is reported at 479 F.Supp. 1172 (1979), and the ordinance is reprinted as an appendix to the opinion. The district court concluded that the ordinance is severable and examined it on a section-by-section basis. We agree that the ordinance is severable and will follow a similar procedure in our analysis.

### A.

The three clinics provide abortions only during the first trimester of pregnancy but are willing to perform early second trimester abortions if permitted to do so. The

* The Honorable Benjamin F. Gibson, Judge, United States District Court for the Western District of Michigan, sitting by designation.

plaintiff physician has performed first trimester abortions at one of the clinics. The district court described the operation of the clinics as follows:

The patients for whom the clinics provide their services range in age from about twelve years to approximately forty-five years. Two of the clinics provide abortions on three days a week (Wednesday, Friday, and Saturday) and the third provides abortions two days a week (Wednesday and Saturday).

Patients usually make their first contact with one of the clinics over the telephone. If a woman telephones and indicates that she desires an abortion and that her pregnancy has not progressed beyond the end of the first trimester, she will be given an appointment for one of the "procedure days." When the patient arrives at the clinic on the day of her appointment she is asked certain questions about her medical history and her pregnancy. She also participates in a group counseling session with counselors employed by the respective clinics. These counselors have varying degrees of qualifications, none, however, is a physician. During the group counseling session, the patients are given information concerning the procedure to be performed upon them, information on birth control techniques, and after-care instructions. At some time near the close of her group counseling session, each patient is asked to sign a document acknowledging her informed consent to the performance of an abortion.

A patient's first contact with the physician who is to perform the abortion procedure usually occurs when she is taken into the operating room. At that time, the physician reviews the patient's medical chart and asks the patient if she has any questions. The doctor then performs a pelvic examination. If the pelvic examination does not reveal any medical problems and, further, indicates that the pregnancy has not progressed beyond the first trimester, the abortion usually will then be performed. There was some evidence that if the physician sensed that the patient was ambivalent concerning her decision, he would suggest that she return at another time after she had had some additional time to consider alternatives to abortion.

The abortion method used at the clinics is dilation and suction curettage (D&C). The procedure itself takes approximately five minutes.

479 F.Supp. at 1181/82.

### B.

We will limit our consideration of the constitutionality of the Akron ordinance to due process issues. The district court gave full and thoughtful consideration to claims of the plaintiffs that the ordinance violates the First Amendment requirement of separation of church and state and the Equal Protection Clause of the Fourteenth Amendment and rejected these claims. We agree with the treatment of these contentions by the district court and with its conclusion, and will not repeat them here.[1]

The district court held that no plaintiff had standing to contest the validity of several provisions of the ordinance. Except where the parties have specifically appealed these rulings, standing will not be discussed in this opinion. The appealed holdings of the district court, described in general terms, were as follows:

(1) Section 1870.03, requiring all abortions after the first trimester to be performed in hospitals, was held valid.

(2) Section 1870.04, dealing with abortions after viability, was not considered by the court because no plaintiff was found to have standing.

(3) Section 1870.05, requiring notice to one of the parents or the legal guardian of a minor seeking an abortion and consent to such an abortion, was held invalid.

---

1. The district court's First Amendment holding is strongly reinforced by the recent opinion of the Supreme Court in *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980).

(4) Section 1870.06(A), requiring informed written consent of the woman seeking an abortion, was held valid.[2]

(5) Section 1870.06(B), detailing the information required to be given by the attending physician in obtaining consent of the woman seeking an abortion, was held invalid.

(6) Section 1870.06(C), requiring the attending physician to detail the particular risks associated with the patient's pregnancy and the abortion technique to be employed, was held valid.

(7) Section 1870.07, requiring a 24-hour waiting period between the time the consent is signed and the abortion is performed, was held valid.

(8) Section 1870.16, requiring that the remains of an aborted fetus be disposed of in "a humane and sanitary manner," was held invalid for vagueness.

## II. The Standard for Testing the Validity of the Ordinance

The plaintiffs contend on appeal that the district court applied an erroneous standard in testing the constitutionality of the various provisions of the ordinance. Rather than requiring the City to demonstrate the necessity of the various provisions to further a compelling interest of the City, the district court tested the ordinance by less stringent standards. In short, it is the position of the plaintiffs that the district court failed to subject the ordinance to the strict scrutiny required by controlling decisions of the Supreme Court.

### A.

The district court acknowledged that the pioneering opinion in the field of abortion law, *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), speaks in terms of the fundamental right of a pregnant woman to make an abortion decision in consultation with her physician and holds that regulations limiting fundamental rights may be justified only by some compelling state in-

terest. Further, any legislative enactment which affects such rights must be narrowly drawn to express only the legitimate state interest at stake. The first point at which the Supreme Court identified a compelling state interest—an interest in the health of the pregnant woman—was "at approximately the end of the first trimester." *Id.* at 163, 93 S.Ct. at 732. However, after reviewing Supreme Court decisions subsequent to *Roe v. Wade*, the district court concluded that a state may impose certain limitations on the right to an abortion, even in the first trimester, so long as these regulations do not "unduly burden" the decision-making process and are rationally related to a legitimate purpose of the state. This conclusion was summarized in the following language of the district court:

It becomes clear, therefore, from an examination of the cases decided since *Roe*, that not all regulation of first trimester abortion providers is impermissible. An absolute prohibition of first trimester abortions could only be justified by a compelling state interest. Likewise, regulations that afford the power to veto a woman's decision to terminate her pregnancy must be supported by a compelling state interest. *See [Planned Parenthood of Central Mo. v.] Danforth*, 428 U.S. [52] at 67–72, 96 S.Ct. 2831 [at 2840–2842, 49 L.Ed.2d 788]. Regulations that interfere with a woman's privacy to a lesser degree, however, require a lesser showing by the state to withstand constitutional attack: "As *Whalen* [*v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977)] makes clear, the right in *Roe v. Wade* can be understood only by considering both the woman's interest and the nature of the State's interference with it." *Maher [v. Roe], supra* 432 U.S. [464] at 473, 97 S.Ct. [2376] at 2382 [53 L.Ed.2d 484].

Accordingly, the Court must determine the degree that each section of Ordinance Number 160–1978 interferes with a woman's constitutional right, in consultation

---

2. Though the holding with respect to section 1870.06(A) was not appealed, it is listed for clarity, since the holdings as to the related

sections 1870.06(B) and 1870.06(C) were appealed and are discussed in this opinion.

with her physician, to choose to terminate her pregnancy. That interference must then be weighed against any valid state interest furthered by such section. Finally, it will be necessary to consider the combined effect of all the various sections not independently unconstitutional to determine whether their combined impact results in such a degree of interference with the constitutional right at issue to result in a finding of invalidity.[22]

[22] Every regulation imposed upon first trimester abortions is going to have some impact upon a woman's right to decide to terminate her pregnancy. That is, any regulation that makes "the physician's work more laborious or less independent," *Whalen v. Roe*, 429 U.S. 589, 605 n. 33, 97 S.Ct. 869, 879 n. 33, 51 L.Ed.2d 64 (1977), is, at least, going to make it more expensive for a woman to effectuate her abortion decision. If the combined weight of a number of regulations, not independently unconstitutional, were to serve to make it unduly burdensome for a woman to carry out her decision, those sections would be invalid.

479 F.Supp. at 1200.

**B.**

We believe the district court read too much into the post-*Wade* decisions of the Supreme Court. In *Planned Parenthood of Missouri v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), the Court found, at least implicitly, that a regulation requiring a pregnant woman to sign a written consent to an abortion did not "restrict the decision of the patient and her physician regarding abortion during the first stage of pregnancy." 428 U.S. at 66, 96 S.Ct. at 2840. The Court also found, explicitly, that a record-keeping requirement of the Missouri statute imposed "no legally significant impact or consequence on the abortion decision or on the physician-patient relationship." *Id.* at 81, 96 S.Ct. at 2846. The validation of these provisions of the Missouri statute was based upon a finding that neither provision involved an intrusion into the decision-making process sufficient to require constitutional analysis. The decision was not based on a holding that the consti-

tutionality of the statute could rest on something less than a compelling state interest. There is no indication in *Danforth* that if the intrusions had been found significant, any state interest less than a compelling one would have served to validate them. The most that may be inferred from *Danforth* is that there are some *slight* intrusions which the state may make into the decision-making process, even during the first trimester of pregnancy.[3] These intrusions are not "legally significant," and do not trigger a further constitutional analysis.

*Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), offers even less support than *Danforth* for the proposition that the constitutionality of the Akron ordinance may be tested by some standard less demanding than a compelling state interest. The statute under attack in *Maher* forbade the expenditure of state funds for nontherapeutic abortions while permitting such expenditures for childbirth. The plaintiffs in *Maher* argued that the statute offended the Equal Protection Clause by creating an impermissible classification. In upholding the statute the Supreme Court emphasized the differences between the funding statute before it in *Maher* and the "drastic" restrictions imposed on the abortion decision by the statute at issue in *Roe v. Wade* [410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147], 432 U.S. at 472, 97 S.Ct. at 2381–2382. Treating childbirth and abortion as two alternative medical methods of dealing with pregnancy, the state was required to demonstrate only that there was a rational relationship between the decision not to fund nontherapeutic abortions and its decision to favor childbirth over abortions. The Court repeatedly emphasized in *Maher* that the Connecticut statute dealt only with funding and did not place any limitations on the right to have an abortion. *See also, Beal v. Doe*, 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977), and *Harris v. McRae, supra.*

As the Court pointed out in *Maher*, "[t]here is a basic difference between direct

3. The record-keeping requirement was characterized by the Court as one which "approach[ed] impermissible limits" of a state's ability to regulate during the first trimester. 428 U.S. at 80, 96 S.Ct. at 2846.

state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy." 432 U.S. at 475, 97 S.Ct. at 2383 (footnote omitted). In *Roe v. Wade,* as in the present case, the state attempted "to impose its will by force of law" by making it a crime to provide services which a pregnant woman is entitled to receive. *Id.* at 476, 97 S.Ct. at 2384. Such a statute impinges directly on a protected activity and requires strict scrutiny. The district court appears to have examined only the "degree" of state interference which each provision of the Akron statute imposed upon the abortion decision. It is clear that the *nature* of the interference must also be examined. *Maher* does not provide support for the claim that an ordinance such as the one now before us may be tested by a more lenient standard. We accept the statements of the Supreme Court that its later cases do not represent a retreat from the *Roe v. Wade* holding that the state's right to regulate abortions, at each stage of pregnancy, must rest on a compelling and legitimate state interest. *E. g., Maher v. Roe, supra,* 432 U.S. at 475, 97 S.Ct. at 2383.

### C.

Consideration of these decisions leads to the conclusion that a two-step analysis is required. First, the nature of the particular regulatory provision must be considered. If it causes no "legally significant impact or consequence" on the right of a pregnant woman, in consultation with a physician, to choose to terminate her pregnancy, it does not raise a constitutional issue. The particular provisions of the Missouri statute (written consent and record keeping) which produced the *Danforth* language relied upon by the defendants here, and the entire thrust of the statute in *Maher,* were of this kind. Only if the provision does result in such significant impact or consequence must a second inquiry be made to determine whether or not the regulatory provision serves a legitimate and compelling state interest. If a compelling state interest is found, the regulation must be examined further to determine whether it imposes an "undue burden" on the abortion decision, that is, whether it is sufficiently narrowly drawn.

We believe the district court applied the test of whether a provision "unduly burdens" the abortion decision at the wrong stage of its inquiry. Once it is found that a regulation constitutes "direct state interference with a protected activity," *Maher, supra,* 432 U.S. at 475, 97 S.Ct. at 2383, here the right of a pregnant woman to have an abortion, that regulation is subject to strict scrutiny. Only then, in the process of balancing the interest of the state against the method chosen to deal with it, does the "unduly burdensome" factor become important. Since the state has no compelling interest during the first trimester of pregnancy, no balancing is required. If a regulation results in a legally significant impact or consequence on a first trimester abortion decision, it is invalid. *See Roe v. Wade, supra,* 410 U.S. at 163, 93 S.Ct. at 732. Further, even though a regulation may relate to a stage of pregnancy during which the state has a compelling interest, nevertheless, the method chosen to effectuate that interest may fail if it unduly burdens the decision to obtain an abortion. As the Court said in *Charles v. Carey,* 627 F.2d 772, 777 (7th Cir. 1980), "the term 'undue burden' defines the ultimate constitutional issue, not merely the threshold requirement for strict scrutiny."

### III. Provisions Affecting All Abortions

We look first at those provisions of the ordinance which apply to all abortions, which necessarily include those performed during the first trimester. Our initial inquiry is to determine if any of them directly interfere with the right of a pregnant woman and her physician to decide whether she should obtain an abortion. As the Supreme Court recently reemphasized in *Colautti v. Franklin,* 439 U.S. 379, 387, 99 S.Ct. 675, 681, 58 L.Ed.2d 596 (1979), this is in all respects a medical decision "up to the point where important state interests provide compelling justifications for intervention . . . ."

A. Parental Notice and Consent[4]

■ The district court held sections 1870.05(A) (parental notice) and 1870.05(B) (parental consent) invalid. Though the original defendants did not appeal these holdings, the intervenors have done so. The intervenors argue that the fundamental right of parents "to control, educate, nurture and guide the actions of their minor children" is one which the state is constitutionally empowered to protect. This right has been recognized recently by the Supreme Court in connection with abortion regulations in *Danforth, supra,* 428 U.S. at 73, 96 S.Ct. at 2843; *Bellotti v. Baird,* 443 U.S. 622, 637–39, 99 S.Ct. 3035, 3045–46, 61 L.Ed.2d 797 (1979); and *H. L. v. Matheson,* —— U.S. ——, ——, 101 S.Ct. 1164, 1171, 67 L.Ed.2d 388 (1981). While parental rights were recognized, the Court held that a "blanket" provision requiring consent of a parent or person standing *in loco parentis* may not be imposed as a condition for abortion of an unmarried minor during her first twelve weeks of pregnancy. *Danforth,* 428 U.S. at 74, 96 S.Ct. at 2843. In *Bellotti,* 443 U.S. at 643, 99 S.Ct. at 3048, the Court noted "the unique nature and consequences of the abortion decision" which make it inappropriate, on the basis of deference to parental rights, to provide a possible third-party veto over the decision of the pregnant woman and her doctor to terminate the patient's pregnancy. We believe the district court correctly applied these principles in finding section 1870.05(B) unconstitutional. *See Wynn v. Carey,* 582 F.2d 1375, 1390

(7th Cir. 1978); *Margaret S. v. Edwards,* 488 F.Supp. 181, 202–03 (E.D.La.1980); *Planned Parenthood Association of Kansas City v. Ashcroft,* 483 F.Supp. 679, 687 (W.D. Mo.1980).

■ The decision in *H. L. v. Matheson, supra,* requires a different treatment of section 1870.05(A). The Utah statute there involved required a physician to "[n]otify, if possible, the parents or guardians of the woman upon whom the abortion is to be performed, if she is a minor or the husband of the woman, if she is married." —— U.S. at ——, 101 S.Ct. at 1166–67. Because the plaintiff in *H. L.* was an unmarried fifteen-year old who resided at home and was dependent on her parents the only decision of the Court was that the Utah statute was not facially unconstitutional when questioned by one in her circumstances. Justices Stewart and Powell were two of the six Court members who made up the majority. In a separate concurrence these Justices emphasized that the opinion of the Court did not decide "whether [the Utah statute] unconstitutionally burdens the right of a mature minor or a minor whose best interests would not be served by parental notification." —— U.S. at ——, 101 S.Ct. at 1173–74 (Powell, J., concurring).

The plaintiffs in the present case are abortion clinics and a physician. No minor female is questioning the validity of the Akron ordinance. The intervenors who appealed the portion of the district court judgment finding section 1870.05(A) invalid

---

4. Akron Ordinance No. 160–1978, Ch. 1870

1870.05  NOTICE AND CONSENT

(A) No physician shall perform or induce an abortion upon an unmarried pregnant woman under the age of 18 years without first having given at least twenty-four (24) hours actual notice to one of the parents or the legal guardian of the minor pregnant woman as to the intention to perform such abortion, or if such parent or guardian cannot be reached after a reasonable effort to find him or her, without first having given at least seventy-two (72) hours constructive notice to one of the parents or the legal guardian of the minor pregnant woman by certified mail to the last known address of one of the parents or guardian, computed from the time of mailing, unless the abortion is ordered by

a court having jurisdiction over such minor pregnant woman.

(B) No physician shall perform or induce an abortion upon a minor pregnant woman under the age of fifteen (15) years without first having obtained the informed written consent of the minor pregnant woman in accordance with Section 1870.06 of this Chapter and

(1) First having obtained the informed written consent of one of her parents or her legal guardian in accordance with Section 1870.06 of this Chapter, or

(2) The minor pregnant woman first having obtained an order from a court having jurisdiction over her that the abortion be performed or induced.

are parents of unmarried minor daughters. Neither the maturity nor condition with respect to emancipation of these minors is shown. The decision of the Supreme Court leads to the conclusion that section 1870.05(A) is a constitutionally permissible regulation insofar as it applies to immature minors who live with their parents, are dependent upon them and are not emancipated by marriage or otherwise. Until the requirements of section 1870.05(A) are questioned by a minor who claims to be mature or emancipated or claims that notice would not be in her best interest, we cannot hold the section facially invalid. The finding that section 1870.05(A) is unconstitutional is reversed.

## B. Informed Consent [5]

■ The plaintiffs have not appealed from the district court's ruling that the general informed consent requirement of section 1870.06(A) is valid. However, the

5. Akron Ordinance No. 160–1978, Ch. 1870

1870.06  INFORMED CONSENT

(A) An abortion otherwise permitted by law shall be performed or induced only with the informed written consent of the pregnant woman, and one of her parents or her legal guardian whose consent is required in accordance with Section 1870.05(B) of this Chapter, given freely and without coercion.

(B) In order to insure that the consent for an abortion is truly informed consent, an abortion shall be performed or induced upon a pregnant woman only after she, and one of her parents or her legal guardian whose consent is required in accordance with Section 1870.05(B) of this Chapter, have been orally informed by her attending physician of the following facts, and have signed a consent form acknowledging that she, and. the parent or legal guardian where applicable, have been informed as follows:

(1) That according to the best judgment of her attending physician she is pregnant.

(2) The number of weeks elapsed from the probable time of the conception of her unborn child, based upon the information provided by her as to the time of her last menstrual period or after a history and physical examination and appropriate laboratory tests.

(3) That the unborn child is a human life from the moment of conception and that there has been described in detail the anatomical and physiological characteristics of the particular unborn child at the gestational point of development at which time the abortion is to be performed, including, but not limited to, appearance, mobility, tactile sensitivity, including pain, perception or response, brain and heart function, the presence of internal organs and the presence of external members.

(4) That her unborn child may be viable, and thus capable of surviving outside of her womb, if more than twenty-two (22) weeks have elapsed from the time of conception, and that her attending physician has a legal obligation to take all reasonable steps to preserve the life and health of her viable unborn child during the abortion.

(5) That abortion is a major surgical procedure, which can result in serious complications, including hemorrhage, perforated uterus, infection, menstrual disturbances, sterility and miscarriage and prematurity in subsequent pregnancies; and that abortion may leave essentially unaffected or may worsen any existing psychological problems she may have, and can result in severe emotional disturbances.

(6) That numerous public and private agencies and services are available to provide her with birth control information, and that her physician will provide her with a list of such agencies and the services available if she so requests.

(7) That numerous public and private agencies and services are. available to assist her during pregnancy and after the birth of her child, if she chooses not to have the abortion, whether she wishes to keep her child or place him or her for adoption, and that her physician will provide her with a list of such agencies and the services available if she so requests.

(C) At the same time the attending physician provides the information required by paragraph (B) of this Section, he shall, at least orally, inform the pregnant woman, and one of her parents or her legal guardian whose consent is required in accordance with Section 1870.05(B) of this Chapter, of the particular risks associated with her own pregnancy and the abortion technique to be employed including providing her with at least a general description of the medical instructions to be followed subsequent to the abortion in order to insure her safe recovery, and shall in addition provide her with such other information which in his own medical judgment is relevant to her decision as to whether to have an abortion or carry her pregnancy to term.

(D) The attending physician performing or inducing the abortion shall provide the pregnant woman, or one of her parents or legal guardian signing the consent form where applicable, with a duplicate copy of the consent form signed by her, and one of her parents or her legal guardian where applicable, in accordance with Paragraph (B) of this Section.

defendants contend on appeal that the district court erred in holding section 1870.-06(B) unconstitutional in its entirety. They argue that the subsections within 1870.-06(B) should be considered separately and that only those requirements which fail to pass constitutional scrutiny, when considered individually, should be voided. We believe the district court properly considered section 1870.06(B) as a unit and correctly concluded that the provision setting forth detailed and specific information which must be given to each abortion patient by the attending physician is impermissible. The requirements of section 1870.06(B) impose "restrictions or regulations governing the medical judgment of the pregnant woman's attending physician with respect to the termination of her pregnancy." *Danforth*, 428 U.S. at 80, 96 S.Ct. at 2846. Such restrictions or regulations are not permitted during the first trimester of pregnancy. The district court correctly held section 1870.06(B) invalid, not because it would burden the physician, but because its effect would be to encumber the exercise of the patient's constitutionally protected right "by placing obstacles in the path of the doctor upon whom she was entitled to rely for advice in connection with her decision." *Whalen v. Roe*, 429 U.S. 589, 604 n. 33, 97 S.Ct. 869, 879 n. 33, 51 L.Ed.2d 64 (1977).

The district court concluded that section 1870.06(C) serves a valid state interest in the health of its female citizens. This section requires counseling by the attending physician and specifies that the physician must advise the patient of the particular risks associated with her own pregnancy and with the abortion technique to be employed. The district court determined that the state could rationally conclude that this counseling should be done by the attending physician rather than another individual. ■ Section 1870.06(C) impinges on the medical judgment of the attending physician in exactly the same way as section 1870.06(B). It requires the doctor to make certain disclosures in all cases, regardless of his own professional judgment as to the

desirability of doing so. Such a requirement is clearly invalid for first trimester abortions. The district court appears not to have considered the nature of the restriction imposed by the section, but only the degree. This was error. Further, the district court required only that the state demonstrate a "valid" interest in maternal health as justification for section 1870.-06(C). A compelling state interest must exist to support a legally significant intrusion into the abortion decision. Finally, even assuming the existence of a compelling state interest, the district court failed to require the defendants to demonstrate that the requirements of section 1870.06(C) are narrowly drawn to serve that interest. As has been stated, the practice of all three plaintiff clinics has been for the counseling to be conducted by persons other than the doctor who performs the abortion. In the absence of a showing that the state's compelling interest in maternal health would be served by a requirement that such counseling be done by the attending physician, this section is invalid.

Rather than attempting to show the existence of a compelling state interest in the regulation, the defendants argue that the requirements of section 1870.06(C) are reasonable and do not unduly burden the abortion decision. We believe section 1870.06(C) suffers from the same infirmities as section 1870.06(B). It seeks to impose a requirement which is unsupported by a compelling state interest but has the effect of encumbering the exercise of the pregnant woman's constitutional right.

It is possible that some of the individual requirements of sections 1870.06(B) and (C) could be successfully defended. *See, e. g., Charles v. Carey, supra; Margaret S. v. Edwards, supra; Planned Parenthood Association of Kansas City v. Ashcroft, supra.* As written, however, they have the effect of going far beyond the valid requirement of section 1870.06(A) and extending the permissible reach of the informed consent provision. We affirm the holding of the district court that 1870.06(B) is invalid and reverse the holding that 1870.06(C) is constitutional.

### C. Waiting Period

Section 1870.07 requires a 24-hour waiting period between the time a pregnant woman signs the consent required in section 1870.06(A) and the time an abortion may be performed. In upholding the validity of this provision, the district court relied primarily upon this court's decision in *Wolfe v. Schroering*, 541 F.2d 523 (6th Cir. 1976). The district court acknowledged that there was no claim in *Wolfe v. Schroering* that this particular regulation significantly burdened the abortion process. *Id.* at 526. In the present case the plaintiffs argue that the waiting period requires an additional trip to the clinic, making the process more expensive, imposes impermissible physical and psychological burdens on a woman seeking a first trimester abortion, and is not narrowly drawn to achieve a lawful objective.

■ Since section 1870.07 causes a legally significant impact or consequence on the abortion decision, it cannot be applied to first trimester abortions. Assuming some state interest in postponing abortion decisions, the evidence falls far short of establishing a compelling interest which is served by the requirement. The obvious effect of the requirement is to impose upon the process of obtaining an abortion a delay which has no medical basis. Though there was evidence that a period of delay before surgery is often beneficial, there was none that an inflexible requirement of a 24-hour waiting period for an abortion serves any interest of the state, much less a compelling interest which is required under strict scrutiny analysis. Medical witnesses for the defendants testified that a reasonable "work-up" time is customary and often necessary prior to surgery. However, none related this in-hospital practice to the very brief procedures involved in early stage abortions.

The unstated purpose of section 1870.07 is to require a "cooling off period" during which second thoughts might come into play. The district court appears to have recognized this effect:

The state interest furthered by the waiting period requirement is the insurance that a woman's abortion decision is made after careful consideration of all the facts applicable to her particular situation. This is an important state interest considering the irreversible nature and possible lasting consequences of the abortion decision.

479 F.Supp. at 1204.

Desirable as such careful consideration may be, it is beyond the state's power to require. *Charles v. Carey, supra*, 627 F.2d at 785–86; *Margaret S. v. Edwards, supra*, 488 F.Supp. at 212–13. We reverse the holding that section 1870.07 is constitutional.

### IV. The Second Trimester "Hospital Only" Requirement

■ Section 1870.03 requires every abortion subsequent to the end of the first trimester of pregnancy to be performed in a hospital. In *Roe v. Wade*, the Supreme Court found that "in the light of present medical knowledge," the state's legitimate interest in the health of the expectant mother became compelling at approximately the end of the first trimester. 410 U.S. at 163, 93 S.Ct. at 731. In that decision the Court gave as one specific example of a constitutional regulation a requirement that abortions subsequent to the first trimester be performed in hospitals. *Id.*

The thrust of the plaintiffs' proof in the present case was to the effect that a procedure known as dilatation and evacuation (D & E), requires a reexamination of certain assumptions of the Court in *Roe v. Wade*. In effect they argue that the use of D & E makes abortion through the 17th or 18th week of pregnancy safer than childbirth. Thus, under *Roe v. Wade*, the state's interest in maternal health does not become compelling before that time because "mortality in abortion may be less than mortality in normal childbirth." 410 U.S. at 163, 93 S.Ct. at 731. By requiring early second trimester abortions to be performed in a more expensive and less convenient setting than out-patient clinics, they contend the state has impermissibly burdened the con-

stitutional rights of pregnant women seeking such abortions. Since there is no compelling state interest at stake before that time, the plaintiffs assert that a regulation requiring abortions to be performed in a hospital prior to the 17th or 18th week of pregnancy does not meet the constitutional requirement that it be narrowly drawn so as to relate only to the state's legitimate interest.

There was an abundance of evidence that D & E is the safest method of performing post-first trimester abortions today. Two qualified physicians testified that it is safe to perform D & E abortions in an out-patient clinic through the 17th or 18th week of pregnancy. One of these witnesses stated that the plaintiff Akron Women's Clinic is adequately equipped and staffed to perform early second trimester abortions. The defendants presented an expert medical witness with unchallenged qualifications who recognized that abortion is "not a static situation" and that there is support for the opinion that early second trimester abortions may be performed safely outside of hospitals. Nevertheless, this witness stated that this proposition "is not clearly established." Furthermore, he testified that the American College of Obstetricians and Gynecologists has made no change in its 1973 recommendation that second trimester abortions be performed only in hospitals.

Evidence of the burden imposed by the requirement of section 1870.03 related to two factors. There was unrebutted testimony that there were only two hospitals in Akron in which second trimester abortions were being performed. During the year preceding trial, only nine such abortions were performed in these two hospitals. It was testified that approximately 10% of the 6,000 women who sought abortions at the Akron clinics during the same period were in their second trimester of pregnancy. Many of these women were referred to clinics in Cleveland, Ohio and in the State of Michigan. Those who were unable to travel to those places were faced with the choice of carrying the baby to term, attempting self-abortion or seeking illegal abortions. The mortality and morbidity incidence of self-abortions and illegal abortions greatly exceeds that of the second trimester D & E procedure. The second burdensome feature of the in-hospital requirement is the cost. It was testified that a second trimester abortion in a hospital costs $850–$900, while total charges for a D & E abortion in a clinic are $350–$400.

The plaintiffs argue that the effect of section 1870.03 is to make second trimester abortions completely unavailable for many women who desire them. Many pregnant women, especially the very young, do not seek an abortion until they have entered the second trimester. Without the ability to travel and the funds to pay for hospital treatment, many of these Akron women have no real opportunity to obtain an abortion.

In its first ruling the district court held that the plaintiffs did not have standing to challenge section 1870.03. However, upon reconsideration the court concluded that the plaintiffs did have standing, and it addressed the merits of the respective positions of the parties. Referring to the decision in *Roe v. Wade*, the district court stated:

> The Court further recognized that the state had a valid interest in maternal health and the protection of potential human life. The state's interest in potential human life was found to become "compelling" at viability. The state's interest in protecting maternal health, "in the light of present medical knowledge," was found to become "compelling" at approximately the end of the first trimester. *Roe, supra* [410 U.S.] at 163, 93 S.Ct. at 731. Section 1870.03 was passed in furtherance of this asserted compelling state interest in protecting maternal health from the close of the first trimester of pregnancy.

479 F.Supp. at 1215.

It then concluded:

> Plaintiffs' attack Section 1870.03 saying that although abortions beyond the end of the first trimester of pregnancy

were safer in a hospital setting at the time of the *Roe* decision, that is no longer true. Plaintiffs presented evidence in the form of testimony and exhibits to support a finding that early second trimester clinical abortions are now just as safe as early second trimester hospital abortions. The Court, however, does not find plaintiffs' evidence on this issue so convincing that it is willing to discard the Supreme Court's formulation in *Roe.* Accordingly, the Court finds that Section 1870.03 furthers the compelling state interest in protection of maternal health and is, therefore, constitutional.

*Id.*

At least two district courts have recently determined that the state's interest in the health of a pregnant woman does not become compelling until the 18th week of pregnancy. *Margaret S. v. Edwards, supra; Planned Parenthood Association of Kansas City v. Ashcroft, supra.* Both holdings were based on findings that widespread use of the D & E method represents a medical advance which makes abortion during early weeks of the second trimester sufficiently safe to eliminate maternal health as a basis for state interference. In each case the district court also found that no hospital in the region was performing post-first trimester abortions. The unavailability of in-hospital D & E abortions in the area resulted in pregnant women and their physicians being forced to use a more dangerous method, in the view of these courts. Both courts relied upon the fact that a ban on the use of the saline instillation method, which resulted in a similar denial of access to abortions, was held unconstitutional in *Planned Parenthood of Missouri v. Danforth, supra.*

The rationale of these decisions appears persuasive. However, the Supreme Court has now affirmed a 3-judge district court decision which found a provision identical to § 1870.03 constitutional. *Gary-Northwest Indiana Women's Services, Inc. v. Bowen,* 496 F.Supp. 894, 896–902 (N.D.Ind.1980), *aff'd sub nom. Gary-Northwest Indiana Women's Services, Inc. v. Orr,* —— U.S. ——, 101 S.Ct. 2012, 68 L.Ed.2d 321 (1981).

Many of the same arguments for holding the requirement that all second trimester abortions be performed in a hospital unconstitutional which were made in the present case were made by the plaintiffs in *Gary-Northwest.* Though the evidence on this issue in the present case was more detailed than that produced in *Gary-Northwest,* the thrust of the plaintiffs' proof and argument was the same. The Supreme Court has now had an opportunity to retreat from the "bright line" drawn in *Roe v. Wade* and has declined to do so. The district court's holding that section 1870.03 is constitutional is affirmed.

## V. Standing

### A.

■■■■ The district court held that none of the plaintiffs had standing to contest section 1870.04 which forbids abortions after viability except to prevent the death or impairment of the health of the pregnant woman. None of the plaintiffs performed abortions after the first trimester and the district court denied permission to a pregnant woman and an Akron doctor who did perform post-first trimester abortions to proceed under pseudonyms. The plaintiffs argue that these persons would have had standing to attack section 1870.04 if they had been permitted to proceed. On the record before us we cannot say it was an abuse of discretion to deny the requests to proceed by pseudonym.

■■■■ A more serious challenge to the standing ruling is contained in the contention of the plaintiffs that the physician-plaintiff should have been granted *jus tertii* standing to represent pregnant women who desire abortions after viability, but who were not before the court. The plaintiffs rely principally upon *Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), where two doctors were found to have standing to assert the rights of their patients. In *Singleton* the doctors sought a holding that a statute which denied Medicaid benefits for non-medically indicated abortions was unconstitutional. The physician-plaintiffs were actually performing abortions for needy patients and were being

denied payment for their services because of the statutory provision in question. In upholding the claim of standing, the Court made two distinct findings—that the plaintiff-doctors suffered "concrete injury" from operation of the statute, *Id.* at 113, 96 S.Ct. at 2873–74, and because of the close relationship between them and their patients, the doctors were "uniquely qualified" to test the statute on behalf of their patients. *Id.* at 117, 96 S.Ct. at 2875–76. Though the plaintiff-doctor in the present case might see and counsel women who desire an abortion after viability, it is clear that he would not perform the abortion.

The district court recognized the principle of *jus tertii* standing:

> Cases involving *jus tertii* (the right of a third party) standing can generally be divided into two categories. The first involves litigants who challenge legislation which imposes regulations upon them and, as a result of the regulations imposed, allegedly deprives third parties of constitutional rights. The second category involves litigants who suffer injury because regulations allegedly impairing constitutional rights of third parties are imposed directly on those third parties whose rights the litigants seek to assert. This case is within the first category. That is, plaintiffs allege that regulations imposed directly on them violate rights guaranteed their patients. Such plaintiffs "have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function."

479 F.Supp. at 1184 (citations omitted). However, denial of such standing to the plaintiff-physician was properly based upon the fact that he had never even expressed a desire to perform a post-viability abortion. Thus, this plaintiff suffered "no injury in fact" from the operation of section 1870.04. Failing to meet this requirement, the plaintiff did not have "a sufficiently concrete interest in the outcome" of this action to make it a case or controversy under Article III of the Constitution. *Singleton v. Wulff,*

*supra,* 428 U.S. at 112, 96 S.Ct. at 2873 (plurality opinion). *See also,* concurring opinion of Mr. Justice Stevens, 428 U.S. at 121, 96 S.Ct. at 2877. Lacking such interest in the outcome, he did not have standing to assert the claims of others despite his claimed "close relationship" with women whom he counseled and whose rights he was seeking to protect. The holding of the district court that no party demonstrated standing to challenge the constitutionality of section 1870.04 is affirmed.

### B.

▆▆▆ The defendants dispute the standing of Dr. Bliss, the physician-plaintiff who remained in the case. Dr. Bliss does not reside in Akron, but has performed first trimester abortions at one of the plaintiff-clinics. He testified that he expected to continue to do so. The district court correctly held that Dr. Bliss has standing as a plaintiff in this case.

### VI. Disposal of Remains

▆▆▆ With respect to section 1870.16, relating to disposal of fetus remains, we agree with the district court that the language is impermissibly vague as definition of a criminal act. The City defendants have urged us to void only the word "humane," arguing that the words "in a . . . sanitary manner" are sufficiently clear. If the City desires to legislate on this subject it should do so either by enacting specific requirements or by referring to regulations which set forth the requirements with specificity. The possibility that the language of section 1870.16 might be construed to mandate some sort of "decent burial" of an embryo at the earliest stages of formation is too real to be overlooked. The district court correctly found section 1870.16 invalid on grounds of vagueness.

The judgment of the district court is affirmed in part and reversed in part. No costs allowed.

CORNELIA G. KENNEDY, Circuit Judge. Concurring in part and dissenting in part.

I respectfully dissent from part II (standard of review), that portion of IIIA relat-

ing to minors under 15, and a portion of IIIB of the majority's opinion.

The District Court ruled that abortion regulations that do not absolutely prohibit or afford the power to veto a woman's decision to have an abortion may withstand constitutional scrutiny though furthering something less than a "compelling" state interest. It held that regulations that interfere with a woman's privacy to a lesser degree may be weighed against any valid state interests furthered by the regulation. The majority, rejecting the District Court's standard, would apply a two-step test. First, if the provision in question causes no "legally significant" impact on the right of a pregnant woman to choose to terminate her pregnancy, it is constitutional. Second, if it causes a legally significant impact, the provision must be supported by a compelling state interest and must be sufficiently narrowly drawn so as not to unduly burden the woman's right. Because I am less certain than the majority that the Supreme Court's abortion decisions call for such a two-step analysis, I am not able to concur with the panel even though I do not completely agree with the District Court either.

Because there appears to have been some shift on the issue in the Supreme Court's decisions a lengthy and detailed review of its cases is required. Language from the earliest abortion decisions supports the majority's conclusion that only a compelling state interest will justify significant first trimester abortion regulation. In *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Court spoke broadly in invalidating a statute that absolutely prohibited abortions except to save the life of the mother:

> Where certain "fundamental rights" are involved, the Court has held that regulation limiting these rights may be justified only by a "compelling state interest" . . .

and that legislative enactments must be narrowly drawn to express only the legitimate state interest at stake.

*Id.* at 155, 93 S.Ct. at 728 (citations omitted).

> [Because the interest in material health becomes compelling at the end of the first trimester], [i]t follows that, from and after this point, a State may regulate the abortion procedure to the extent that the regulation relates to the preservation and protection of maternal health. . . . This means, on the other hand, that, for the period of pregnancy prior to this "compelling" point, the attending physician, in consultation with his patient, is free to determine, without regulation by the State, that, in his medical judgment, the patient's pregnancy should be terminated.

*Id.* at 163, 93 S.Ct. at 732.

> Up to [this point], the abortion decision in all its aspects is inherently, and primarily, a medical decision, and basic responsibility for it must rest with the physician.[1]

*Id.* at 166, 93 S.Ct. at 733.

In the next case, *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), the Court appears to be ambivalent as to the proper standard of review, though the case signals at least some retreat from the broad language of *Roe*. In relevant part the Court held that Missouri could not give an absolute veto over a woman's abortion decision to the woman's spouse or parents. However, Missouri could impose record keeping requirements on an abortion clinic that it did not impose for other surgical procedures; the record keeping requirement did not have a "legally significant" impact on the abortion decision or the physician-patient relationship. *Id.* at 81, 96 S.Ct. at 2846.[2] Thus far *Planned Parent-*

---

1. The Supreme Court did not use the word "significant" to distinguish permissible and impermissible first trimester regulation in *Roe v. Wade*. Indeed, the Court's language prohibited *all* first trimester abortion regulation. However, even in *Roe* the Court, without explanation, permitted a state to proscribe any abor-

tion not performed by a physician. 410 U.S. at 165, 93 S.Ct. at 733.

2. This is apparently the basis for the threshold requirement of "legal significance" in the majority's test. However, because the term "legally significant" as used by the Supreme

*hood* is consistent with both the District Court's and the majority's test.

In the course of its opinion in *Planned Parenthood* the Court quoted language from *Roe v. Wade* that can be used to support the majority's test:

> "For the stage prior to approximately the end of the first trimester, the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician," without interference from the State.

*Id.* at 61, 96 S.Ct. at 2837.[3]

On the other hand, the Court held that Missouri could require that the woman consent in writing to the abortion procedure, though such a requirement was not imposed for other types of surgery, because "[t]he decision to abort, indeed, is an important, and often a stressful one . . . ." *Id.* at 67, 96 S.Ct. at 2840. It is possible that such a consent requirement is "legally insignificant," or "furthers a compelling state interest," and the Supreme Court's holding is therefore consistent with the standard developed by the majority. However, the Court did not analyze the requirement in this way. Indeed, in *Bellotti v. Baird,* 428 U.S. 132, 147, 96 S.Ct. 2857, 2866, 49 L.Ed.2d 844 (1976) (*Bellotti I*), the Court stated that *Planned Parenthood* held the consent requirement constitutional because it did not "unduly burden" the right to seek an abortion.

At issue in *Bellotti I* was the constitutionality of a Massachusetts statute requiring parental consent to abortions for unmarried minors. The Supreme Court remanded the case so the district court could get an au-

thoritative construction of the statute from the Massachusetts Supreme Judicial Court. The Supreme Court stated that it did not need to determine the point at which review of a woman's consent or of good cause for an abortion in the case of a minor becomes "unduly burdensome," 428 U.S. at 148, 96 S.Ct. at 2866, or whether a court hearing to determine whether informed consent was given would "unduly burden" the rights of an adult. *Id.* at 147, 96 S.Ct. at 2866. No mention is made in *Bellotti I* of any compelling state interest. Again, the facts of *Bellotti I* do not militate against either the majority's or the District Court's standard. However, the Supreme Court's language indicates that the panel's formulation is incorrect.

*Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), held that the Constitution does not require states to fund non-therapeutic abortions. The Supreme Court observed that the court below had read *Roe v. Wade* and progeny

> as establishing a fundamental right to abortion and therefore concluded that nothing less than a compelling state interest would justify Connecticut's different treatment of abortion and childbirth. We think the District Court misconceived the nature and scope of the fundamental right recognized in *Roe.* . . . We held [in *Roe*] that only a compelling state interest would justify such a sweeping restriction on a constitutionally protected interest, and we found no such state interest during the first trimester. . . . In subsequent cases, we have invalidated other types of restrictions different in form but similar in effect, on the woman's freedom

---

Court did no more than state a conclusion, it is not helpful in *reaching* a conclusion.

**3.** The Court recently quoted from *Roe* to the same effect in invalidating a statute which required a certain abortion technique where the fetus "may be viable":

> . . . up to the points where important state interests provide compelling justifications for intervention, "the abortion decision in all its aspects is inherently, and primarily, a medical decision" . . . .

*Colautti v. Franklin,* 439 U.S. 379, 387, 99 S.Ct. 675, 681, 58 L.Ed.2d 596 (1979).

Insofar as this language suggests that no regulation of abortion is permitted before the end of the first trimester absent a compelling justification, it supports the majority's standard. However, since the purpose of *Colautti* was to emphasize the central role of the physician in the abortion decision, and other Supreme Court cases, *infra,* indicate that *Roe* did not prohibit all such first trimester regulation, the quote is entitled to little weight on the issue of the standard of review.

of choice. . . . Although a state-created obstacle need not be absolute to be impermissible . . . we have held that a requirement for a lawful abortion "is not unconstitutional unless it *unduly burdens* the right to seek an abortion." . . . As *Whalen* [*v. Roe,* 429 U.S. 589, 599–600, 97 S.Ct. 869, 876–877, 51 L.Ed.2d 64] makes clear, the right in *Roe* can be understood only by considering both the woman's interest and the nature of the State's interference with it. *Roe* did not declare an unqualified "constitutional right to an abortion," as the District Court seems to think. Rather, the right protects the woman from *unduly burdensome* interference with her freedom to decide to terminate her pregnancy.

*Id.* at 472–474, 97 S.Ct. at 2382 (citations omitted) (emphasis added).

The Court also upheld Connecticut's requirement that a woman who sought state funding for a therapeutic abortion submit her request in writing and get the prior approval of the Connecticut Department of Social Services. *Id.* at 480, 97 S.Ct. at 2386. The Court found the requirement reasonable although there was no similar requirement for other forms of surgery because "such [other] procedures do not involve the termination of a potential human life." *Id.*

The majority distinguishes *Maher* by pointing out the Supreme Court's emphasis that the case did not involve limitations on the right to an abortion. While true, this means only that the *facts* of *Maher*, like the *facts* of *Roe v. Wade, Planned Parenthood,* and *Bellotti I,* do not determine the correct standard. The majority also attaches significance to language in *Maher* in which the Supreme Court states that its "conclusion signals no retreat from *Roe* or the cases applying it." *Id.* at 475, 97 S.Ct. at 2383. The majority interprets this as signalling "that the [Supreme Court's] later cases do not represent a retreat from the *Roe v. Wade* holding that the state's right to regulate abortions, at each stage of pregnancy, must rest on a compelling and legitimate state interest." However, when the Court in *Maher* announced that it was not retreat-

ing from *Roe,* it meant only that it was not retreating from *Roe* as it had interpreted *Roe* in the preceding pages of its opinion in *Maher,* that is, to forbid "unduly burdensome" regulation of abortions.

In *Bellotti v. Baird,* 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (*Bellotti II*), the Court struck down a Massachusetts statute requiring parental consent to abortions for mature minors. The four-justice plurality framed the issue thus:

The question before us—in light of what we have said in the prior cases—is whether [the statute], as authoritatively interpreted by the Supreme Judicial Court, provides for parental notice and consent in a manner that does not *unduly burden* the right to seek an abortion.

*Id.* at 640, 99 S.Ct. at 3046 (emphasis added).

The plurality concluded that as construed the statute

would impose an *undue burden* upon the exercise by minors of the right to seek an abortion. . . . [U]nder state regulation such as that undertaken by Massachusetts, every minor must have the opportunity—if she so desires—to go directly to a court without first consulting or notifying her parents.

*Id.* at 647, 99 S.Ct. at 3050 (emphasis added).

The plurality added that "the constitutional right to seek an abortion may not be *unduly burdened* by state-imposed conditions upon initial access to court." *Id.* at 648, 99 S.Ct. at 3051 (emphasis added).

The requirement of either going to court or notifying one's parents is clearly a significant burden. Therefore, to be consistent with the panel's analysis the Supreme Court should have found a compelling state interest before inquiring whether the statute would unduly burden the right to seek an abortion. The plurality found the state's interest in encouraging a family resolution of a minor's abortion decision "important." *Id.* at 648, 99 S.Ct. at 3051. It never found

the state's interest compelling.[4] Thus, while the result in *Bellotti II* may be consistent with the standard of review suggested by the panel the plurality's analysis is not.

*Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), upheld as constitutional the Hyde Amendment, which forbade the use of federal funds for abortions. The Court stated:

> The doctrine of *Roe v. Wade*, the Court held in *Maher*, "protects the woman from *unduly burdensome* interference with her freedom to decide whether to terminate her pregnancy," *id.* [432 U.S.], at 473–474 [97 S.Ct. at 2382–83], such as the severe criminal sanctions at issue in *Roe v. Wade, supra*, or the absolute requirement of spousal consent for an abortion challenged in *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52 [96 S.Ct. 2831, 49 L.Ed.2d 788].

*Id.* 448 U.S. at 314, 100 S.Ct. at 2686 (emphasis added).

Again, the Supreme Court's language indicates that the panel's formulation is incorrect.

The most recent case to deal with abortions is *H. L. v. Matheson*, —— U.S. ——, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981), where the Court held constitutional a requirement that unmarried, immature minors under the age of 15 notify their parents of their decision to seek an abortion. The Court observed that the statute did not involve an absolute veto, and that it served "important considerations" and "significant state inter-

ests." *Id.* —— U.S. at ——, 101 S.Ct. at 1173–74. The Court did not engage in the two-step analysis suggested by the panel.

Thus, the Supreme Court has never suggested the analysis put forth by the majority. It has sometimes suggested that a compelling state interest is necessary to justify any state regulation of abortion during the first trimester, but that language has always been far broader than required by the facts before it. With the exception of the passage in *Colautti, supra*, and a part of *Planned Parenthood*, all of the cases since *Roe* have suggested that the proper standard is simply whether a regulation that does not effectively prohibit abortions is "unduly burdensome" to the decision whether or not to abort. The Court's decisions are all consistent with that standard. Although this standard is very close to that applied by the District Court, it differs in that the District Court required that the prohibition or veto be absolute before it must be justified by a compelling state interest.[5]

My resolution of the remaining issues, however, does not depend on whether I apply the majority's standard, that of the District Court, or what I perceive to be the Supreme Court's position.

Section 1870.05(B) requires for a minor under the age of 15 either consent of a parent or "an order from a court having jurisdiction over her that the abortion be performed or induced" as a condition of terminating pregnancy. The District Court invalidated section 1870.05(B) because it did

---

4. It may be argued that the Court simply applies a different standard of review in the case of minors. However, the Court has not said that it does, and it is not clear why the standard of review, rather than the relative weights of the parties' interests, should change. The state's interests in the case of minors are weightier, and thus lead to a different outcome in the balancing process.

5. *Charles v. Carey*, 627 F.2d 772, 777–778 (7th Cir. 1980), is not persuasive support for the majority's decision. The district court in that case held that a law that unduly burdens the abortion decision is subject to strict scrutiny. The Seventh Circuit held that "the term 'undue burden' defines the ultimate constitutional is-

sue, not merely the threshold requirement for strict scrutiny." *Id.* at 777. With this statement I agree. I do not take the additional step of subjecting all regulations of abortion that are not *de minimis* to the compelling state interest standard.

The Seventh Circuit's concern that plaintiffs who must challenge abortion regulations on other than an across-the-board "compelling state interest" standard will be unable to anticipate the state's possible justifications for the regulations simply does not ring true in the abortion context. Nor do I share the Seventh Circuit's concern that the courts are incapable of determining when a burden on the abortion decision is "undue."

not protect the abortion decision of a mature minor, and the majority affirms this decision. The District Court, however, made no attempt to construe section 1870.-05(B) in a constitutional fashion.

In *H. L. v. Matheson* the Utah statute required a minor's physician "to notify, if possible, the parents or guardian of the woman upon whom the abortion is to be performed, if she is a minor...." —— U.S. at ——, 101 S.Ct. at 1166–67. In an unrelated case the federal district court in Utah had held that this statute did not apply to unemancipated minors. *L. R. v. Hansen,* Civil No. C–80–0078J (Feb. 8, 1980). Because the minor who brought suit in *Matheson* did not show that she was mature or emancipated, she lacked standing to challenge the statute as applied to such minors, and the Supreme Court was "unwilling to assume that the statute, when challenged in a proper case, will not be construed also to exempt demonstrably mature minors." —— U.S. at ——, 101 S.Ct. at 1169.

Similarly, in *Bellotti I,* the Supreme Court remanded for authoritative construction a statute that required parental consent to abortions for minors. "[I]n light of our disapproval of a 'parental veto' today in *Planned Parenthood,* we must assume that the lower Massachusetts courts, if called upon to enforce the statute pending interpretation by the Supreme Judicial Court, will not impose this most serious barrier." 428 U.S. at 151, 96 S.Ct. at 2868.

Section 1870.05(B) is capable of a construction that would render it constitutional. This would be the case if, for example, the order from "a court having jurisdiction" was based, as it constitutionally must be, first on an inquiry into the minor's maturity. Thus, the section is not facially invalid. As the majority notes in reversing the District Court's holding that section 1870.05(A) is unconstitutional, no minor challenges the Akron ordinance. I would not find section 1870.05(B) unconstitutional until a mature minor challenges it and until it has been construed by a lower court.

I also dissent from that portion of the panel's opinion which reverses the holding of the District Court that § 1870.06(C) is constitutional. This section requires that the attending physician advise the patient of

the particular risks associated with her own pregnancy and the abortion technique to be employed including providing her with at least a general description of the medical instructions to be followed subsequent to the abortion in order to insure her safe recovery, and shall in addition provide her with such other information which in his own medical judgment is relevant to her decision as to whether to have an abortion or to carry her pregnancy to term.

The majority holds that this provision infringes on the medical judgment of the attending physician. The section does not, however, interfere with the patient's right to decide whether to terminate her pregnancy. *Cf. Colautti v. Franklin,* 439 U.S. at 392–394, 396, 99 S.Ct. at 684–85, 686 (1979); *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. at 64, 96 S.Ct. at 2839; *Roe v. Wade, supra.* Further, the witnesses who testified at trial agreed that the information should be given to the patient. Indeed, in *Planned Parenthood v. Danforth,* the Court stated that "[t]he decision to abort is an important, and often a stressful one, and it is desirable and imperative that it be made with full knowledge of its nature and consequences." 428 U.S. at 67, 96 S.Ct. at 2840. The Court considered that informed consent meant

the giving of information to the patient as to just what would be done and as to its consequences. To ascribe more meaning than this might well confine the attending physician in an undesired and uncomfortable straitjacket in the practice of his profession.

*Id.* n. 8. The Utah statute at issue in *H. L. v. Matheson* provided that no abortion could be performed

unless a "voluntary and written consent" is first obtained by the attending physician from the patient. In order for such a consent to be "voluntary and informed," the patient must be advised at a

minimum about available adoption services, about fetal development, and about foreseeable complications and risks of an abortion.

—— U.S. at —— n. 1, 101 S.Ct. at 1167 n. 1. In upholding this requirement, the Supreme Court simply noted that in *Planned Parenthood v. Danforth* "we rejected a constitutional attack on written consent provisions." *Id.* Thus, the Supreme Court apparently does not believe that the limited information required by .06(C) imposes an undue burden on the physician. The giving of such information enhances, rather than restricts, the woman's freedom of choice. "Informed consent" without this information would be worthless. *See also Wolfe v. Schroering,* 541 F.2d 523, 526 (6th Cir. 1976).

Plaintiffs' objection is not to the giving of the information, but rather to the requirement that the information be given by a physician. The Supreme Court has repeatedly recognized the importance of the physician-patient relationship to the abortion decision. Several times the Court has stated that during the first trimester the physician, in consultation with his patient, must be free to determine that in his medical judgment the patient's pregnancy should be terminated. *Bellotti II,* 443 U.S. at 641 n. 21, 643, 99 S.Ct. at 3047, n. 21, 3048; *Colautti v. Franklin,* 439 U.S. at 387, 99 S.Ct. at 681; *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. at 61, 96 S.Ct. at 2837; *Roe v. Wade,* 410 U.S. at 163, 164, 93 S.Ct. at 732. In *Planned Parenthood* the Court emphasized "participation by the attending physician [in the abortion decision] and his responsibility in that decision . . . ." 428 U.S. at 61, 96 S.Ct. at 2837. In *Roe,* the Court would have permitted a state to require that abortions be performed by a licensed physician, which at least strongly implies the state's interest in ensuring the existence of a physician-patient relationship. 410 U.S. at 165, 93 S.Ct. at 732–733. As the Court observed in *Colautti,* "*Roe* stressed repeatedly the central role of the physician, both in consulting with the woman about whether or not to have an abortion, and in determining how any abortion was to be carried out." 439 U.S. at 387, 99 S.Ct. at 681.

The requirement that the information specified in .06(C) be given by a physician does no more than seek to ensure that there is in fact a true physician-patient relationship even for the woman who goes to an abortion clinic. The evidence presented at trial showed that the decision to terminate a pregnancy was made not by the woman in conjunction with her physician, but by the woman and lay employees of the abortion clinic, the income of which is dependent upon the woman's choosing to have an abortion. The testimony disclosed that the doctors at Akron Center's clinic did little, if any, counseling before seeing the patient in the procedure room. Akron's ordinance simply takes into account these realities of the "physician-patient" relationship at an abortion clinic.

I concur in the majority's conclusion that the 24-hour delay imposed by § 1870.07 is unconstitutional. However, the state has a strong interest in ensuring a carefully considered abortion decision, the 24-hour delay is substantially related to that state interest, and in many instances the delay imposes no undue burden on the right to an abortion. Nonetheless, .07 as it now stands is overbroad. For example, it would require a 24-hour delay even where the delay would impose a grave risk to the mental health of the pregnant woman, where the woman has already been counseled by a physician, or where the delay would cause such significant extra expense to an individual as to unduly burden if not effectively prohibit the decision. The Supreme Court requires closer attention to the circumstances of individual cases in the abortion context. *Bellotti II,* 443 U.S. at 643, n. 23, 99 S.Ct. at 3048, n. 23.

I concur in the balance of the majority's opinion.