552 F.Supp. 791 (1982)
AMERICAN COLLEGE OF OBSTETRICIANS AND GYNECOLOGISTS, PENNSYLVANIA SECTION, et al.
v.
Richard THORNBURGH, et al.
Civ. A. No. 82-4336.
United States District Court, E.D. Pennsylvania.
December 10, 1982.
*792 *793 Laurence Z. Shiekman, Thomas E. Zemaitis, Pepper, Hamilton & Scheetz, Kathryn Kolbert, Women's Law Project, Philadelphia, Pa., for plaintiffs.
Andrew S. Gordon, Deputy Atty. Gen., Com. of Pa., Harrisburg, Pa., for defendants.
John E. McKeever, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., amicus.

MEMORANDUM
HUYETT, District Judge.

I. INTRODUCTION
This is an action for declaratory and injunctive relief pursuant to the United States Constitution and 42 U.S.C. § 1983 in which the plaintiffs challenge the constitutionality of the Pennsylvania Abortion Control Act (Act), 18 Pa.Con.Stat.Ann. §§ 3201-3220. I have subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3), & 1343(a)(4). Before me is plaintiffs' motion for preliminary injunction. On December 7, 1982, because the Act was to take effect the next day, I issued my order and decree on the plaintiffs' motion. This opinion is the statement of my reasons for ruling as I did.
The plaintiffs are physicians, a physicians' professional organization, several clinic providers of first-trimester abortions, members of the clergy and an individual *794 whose health care and disability insurance provides comprehensive abortion coverage. The named defendants are seven state and local officials sued personally and in their official capacities (hereafter sometimes referred to collectively as the Commonwealth). Several physicians and a pregnancy counseling service moved to intervene as defendants and for appointment as guardians ad litem. The motion was denied, however, the applicants for intervention (hereafter amici) were granted amici curiae status.
The Act became law on June 11, 1982. Almost four months later plaintiffs filed their complaint. Plaintiffs' motion for a preliminary injunction was filed on October 29, 1982, almost a month after the complaint was filed. Following a conference in chambers on November 17, 1982, it was determined that December 2, 1982 was the earliest date by which the parties could fully brief the complex constitutional issues and prepare the factual presentation required by the motion. The parties' stipulation of uncontested facts,[1] their proposed findings of fact and conclusions of law were submitted to me on November 30, 1982. A conference was held in chambers on December 1, 1982. On December 2, 1982, I held a hearing on plaintiffs' motion. Because of the parties' comprehensive stipulation of uncontested facts, no testimony or evidence was submitted at the hearing. Counsel for the plaintiffs, defendants, and amici presented oral argument. At the conclusion of the December 2, 1982 hearing, I took the matter under advisement. The effective date of the Pennsylvania Act is December 8, 1982.
The following constitutes my findings of fact and conclusions of law. Based upon my findings and for the reasons stated below, I conclude that the Act as a whole and the specific subsections challenged are constitutional with the exception of the 24-hour waiting period in § 3205.
I reach this conclusion after the most thoughtful consideration of these complex issues which time permitted. As the procedural history of this case outlined above reveals, despite the complexity and importance of the issues, this case has proceeded rapidly under pressure from the effective date of the Act. Within only 2 months of the filing of the complaint and just 6 days after the case was submitted to me, the Act which plaintiffs contend violates the Constitution became law.
Although the Pennsylvania Act and the challenge to it are recent developments in this circuit, some but not all of the subsections challenged here are similar to provisions the constitutionality of which has been litigated in the Sixth Circuit in Akron Center for Reproductive Health, Inc. v. City of Akron, 651 F.2d 1198 (6th Cir.1981) (Akron Center v. Akron) and in the Eighth Circuit in Planned Parenthood Association v. Ashcroft, 655 F.2d 848 (8th Cir.1981) (PPA v. Ashcroft). The decisions in Akron and Ashcroft are not consistent on a number of common issues. These decisions have tended as much to obfuscate as to enlighten my analysis of the present case. Both decisions are before the Supreme Court which heard argument in the cases on December 4, 1982. 51 U.S.L.W. 3433 (U.S. Dec. 7, 1982).
While the pressure of the effective date is real and the plaintiffs are entitled to an adjudication of their request for relief pendente lite, it is with a certain level of frustration that I observe that within six months to a year the Supreme Court may issue an opinion which will be likely to resolve many of the issues that I have held under advisement for just a few days. Further, I must agree with Judge Adams' observation in Planned Parenthood v. Fitzpatrick, 401 F.Supp. 554, 586 (E.D.Pa.1975) (Adams, J., concurring and dissenting), that "it is open to some doubt whether the courts are the institution best equipped to resolve the complex societal interests that *795 exist in the abortion field." This is an area perhaps better left in the hands of popularly elected legislators. In approaching this decision, I was mindful of Judge Adams' admonition in Fitzpatrick that courts should be "reluctant to leap ahead too quickly to interdict states from legislating respecting abortions when, in the accumulative informed judgment of the legislators, such enactments are necessary to serve legitimate interests of the populance." Id.

II. STANDING
The plaintiffs in this action can be divided into five different groups. The defendants challenge the standing of only one of those groups, clergymen who sue in individual and representative capacities.
Plaintiff physicians have standing to assert both their own rights and those of their women patients to challenge the constitutionality of the sections at issue in this case. Singleton v. Wulff, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), Planned Parenthood v. Danforth, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976). Plaintiff American College of Obstetricians and Gynecologists, Pennsylvania Section, an organization of obstetricians and gynecologists, has standing to represent the interests of its members and of their patients. Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). Plaintiff medical providers similarly have standing to raise the constitutional rights of their customers. Women's Medical Center v. Roberts, 512 F.Supp. 316 (D.R.I.1981).
The defendants have not challenged the standing of plaintiff Morgan Plant. Plant is an individual who currently purchases and will continue to purchase health care and disability insurance, which comprehensively covers abortions, from an insurer in Pennsylvania. Plant sues on her own behalf and on behalf of all persons similarly situated. It appears that Plant does not have standing to challenge § 3215(e), because there is no evidence that comprehensive insurance premiums will be more costly after the Act goes into effect than before the enactment as a result of the challenged provision. Consequently, Plant has not shown the "injury in fact" required by Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) and its progeny. Nevertheless, in the absence of briefing or oral argument on this point by any of the parties, and in light of the time constraints involved, I will reach the merits of the insurance claim.
Finally, I conclude that plaintiff clergymen do not have standing either as individuals or on behalf of women whom they counsel. Plaintiff clergymen fail to meet the constitutional requirements for standing, in both individual and representative capacities, articulated in free exercise cases. I find that the challenged provisions have no direct impact on the plaintiff clergymen as individuals, because the Act has no provisions which directly or indirectly concern religious counseling. Consequently, I conclude that the clergymen have failed to meet the requirements of injury in fact required in Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).
Further, I conclude that the clergymen do not have standing in a representative capacity. A free exercise claim ordinarily requires individual participation. Harris v. McRae, 448 U.S. 297, 321, 100 S.Ct. 2671, 2690, 65 L.Ed.2d 784 (1980). "It is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion." Abington School District v. Schempp, 374 U.S. 203, 233, 83 S.Ct. 1560, 1577, 10 L.Ed.2d 844 (1963). In Harris v. McRae, the Supreme Court held that representatives of a division of the United Methodist Church did not have standing to sue on behalf of women who seek abortions for religious reasons. Consequently, a free exercise claim in this case can be pursued only by a woman who seeks "an abortion under compulsion of religious belief." 448 U.S. at 320, 100 S.Ct. at 2689.
I, therefore, conclude that the plaintiff members of the clergy lack standing. Thus, *796 I need not address the merits of the plaintiffs' arguments concerning the Free Exercise Clause because no plaintiff has standing to raise it.

III. STANDARD OF REVIEW
The standard of review applicable to each of the plaintiffs' challenges must be determined. The parties stated at oral argument that they are in disagreement over the proper standard. The plaintiffs contend that if the state has imposed a legally significant burden on a fundamental right such as a woman's right of privacy, then the burden must be related to a compelling state interest and the statutory section imposing the burden must be narrowly drawn to achieve that compelling interest. The Commonwealth contends that the appropriate inquiry is whether the Act imposes an "undue burden."
I do not believe that a meaningful distinction can be made between the plaintiffs' "legally significant burden" and defendants' "undue burden." I will employ the plaintiffs' term.
If a legally significant burden on the exercise of a fundamental right is found to exist, then plaintiffs are correct that the compelling state interest standard is applied to determine the constitutionality of the statute imposing the burden. If no burden is found and no suspect class is involved, the issue is simply whether the state had a rational basis for making the classification contained in the statute. See J. Nowak, R. Rotunda & J.N. Young, Constitutional Law 68 (1978).
The right to privacy which encompasses a woman's decision to terminate her pregnancy is a fundamental right. The imposition of a legally significant burden on that right would have to be justified by a compelling state interest. See Maher v. Roe, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977). In Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) the court held no compelling state interest justified a sweeping prohibition of abortion. In the first trimester, the Court concluded that little or no regulation was permissible. The Court went on, however, to conclude that even when judged against the demanding compelling state interest test, "the State's dual interest in the health of the pregnant woman and the potential life of the fetus [are] sufficient to justify substantial regulation of abortions in the second and third trimesters." Maher v. Roe, 432 U.S. at 472, 97 S.Ct. at 2382. Each interest, health of the woman and life of the fetus, becomes compelling at some point in the pregnancy. Roe v. Wade, 410 U.S. at 162-63, 93 S.Ct. at 731. As the interest becomes "compelling" it justifies some interference with the woman's fundamental right by way of regulation.
In the second trimester, the State's interest in the health of the pregnant woman justifies state regulation reasonably related to that concern.... At viability, usually in the third trimester, the State's interest in the potential life of the fetus justifies prohibition with criminal penalties, except where the life or health of the mother is threatened.
Id. at 162-64, 93 S.Ct. at 731-32.
Thus, the right to privacy which protects a woman's decision to terminate her pregnancy, while fundamental, is not absolute. In other areas of constitutional law, if the compelling state interest or "strict scrutiny" standard applies, it has nearly always been fatal to the state law or act under consideration. See L. Tribe, American Constitutional Law 1000 (1978). In the area of abortion decisions, a compelling state interest has been found to support the challenged state law or act. See PPA v. Ashcroft, 655 F.2d 848 (8th Cir.1981).
The fact that the right involved here is not absolute effects as well the analysis of whether a legally significant burden has been imposed which would trigger strict scrutiny. The Court has observed that "[a]lthough the state-created obstacle need not be absolute to be impermissible, we have held that a requirement for a lawful abortion `is not unconstitutional unless it unduly burdens the right to seek an abortion.'" Maher v. Roe, 432 U.S. at 473, 97 S.Ct. at 2382. See also Beal v. Doe, 432 *797 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977). The Court has also stated that whether a state's regulation of abortion will be found to be constitutional will "depend upon its degree and the justification for it." Id. Thus, to determine what constitutes a legal significant burden, one must look to the right allegedly burdened. In the case of the right to privacy to choose an abortion, the existence of a legally significant burden will be a matter of degree.

IV. 24-HOUR WAITING PERIOD  § 3205
Section 3205 of the Act requires that there be a 24-hour waiting period between the time a woman seeking an abortion is provided the information specified in that section and the time the abortion is performed. Section 3205 applies to all abortions regardless of which trimester of pregnancy is involved.
Plaintiffs contend that because this provision precludes the performance of an abortion, albeit for a temporary period, it imposes a legally significant burden on the effectuation of the abortion decision. Defendants contend that the 24-hour waiting period serves several useful purposes consistent with the Commonwealth's desire to further the public policy of encouraging childbirth over abortion. Additionally, the Commonwealth contends that a waiting period promotes truly informed decision-making by the woman.
A mandatory 24-hour waiting period could have the effect of a much longer delay because of the nature of the working schedules of clinics and physicians. The 24-hour waiting requirement will require clinics and physicians to change their current practices and may increase the costs to the clinics and physicians. They intend to pass along these increased costs to their patients. (¶ 131) Moreover, this provision, because it requires at least two visits to an abortion provider, will require women who must travel long distances to make two trips or to incur additional expense for overnight lodging in order to effectuate their abortion decision. The economic impact of this provision is further increased as it may require women who are employed to take additional time off from work. (¶¶ 123, 124)
More fundamentally, the record demonstrates that the delay occasioned by this provision is contrary to the best medical interests of women seeking abortions.
National studies show that the earlier an abortion is performed, the safer it is. (¶ 88) Each week of delay in performing an abortion increases the complication rate by 15-30% and the death rate by 50%. (¶ 89) I find that the 24-hour delay imposed by the statute would have a substantial impact on the health of a woman seeking an abortion. The risks of complications and mortality increase substantially with each week of delay in the performance of the abortion. (¶ 89) In some cases, the delays caused by this requirement may cause patients to enter into the second trimester of pregnancy thereby substantially increasing the cost of the procedure and making the procedure more dangerous. (¶¶ 89, 123) Thus, a 24-hour delay, which stands to grow to a considerably longer delay because of the practices of the abortion providers, directly harms the medical interests of women.
Virtually every federal court which has been required to pass on similar provisions has found them unconstitutional. In Akron Center v. Akron, the Sixth Circuit stated that the obvious effect of a 24-hour wait is to impose upon the process of obtaining an abortion a delay which has no medical basis. 651 F.2d at 1208. The court concluded that although a period of delay before surgery is often beneficial, an inflexible requirement of a 24-hour waiting period for an abortion does not serve the compelling state interest which is required under strict scrutiny analysis. Id.
Similarly, the court in PPA v. Ashcroft stated that a 48-hour waiting period requirement in that case was unconstitutional because it increased delay and delay increased the risk to the woman. 655 F.2d at 866.
The weight of authority holds and I conclude that the 24-hour waiting period *798 which imposes a mandatory, temporary denial of an abortion is a legally significant burden on a woman's right to seek an abortion. There is no state interest during the first trimester of pregnancy which justifies this burden. Further, the 24-hour waiting period has a detrimental effect on the health interests of women seeking abortions. Thus, it is contrary to the state's compelling interest in the second trimester, maternal health. For these reasons and based on the record produced before me, I conclude that the plaintiffs have shown a likelihood of success on the merits of their claim that the 24-hour waiting period is unconstitutional.

V. DOCTOR-ONLY REQUIREMENT  § 3205(a)(1)
Plaintiffs challenge the provision of § 3205(a)(1) requiring that the information required to be disclosed to the patient by subsection (a)(1) be imparted by the physician and not his agent.
The plaintiffs maintain that this "doctor-only" requirement will have a legally significant impact on the operation of medical providers which use trained counselors rather than physicians to discuss the abortion decision with patients and to secure a woman's informed consent. Plaintiffs argue that this requirement will result in an increase in the cost of abortions and will thereby restrict access to abortions without any legitimate state justification. Defendants, on the other hand, argue that the requirement does not interfere with the woman's abortion decision is justified by a legitimate state policy of insuring physician-patient consultation, and thereby promotes the state's interest in the health of its citizens and is permissible under existing decisional law.
The parties have stipulated that the doctor-only requirement will require the plaintiffs to change their current practices. The parties further agree that such a change will increase costs to the plaintiff clinics, which costs will be passed along to women patients. (Stip. § 120)
Nevertheless, I conclude that the "doctor-only" requirement does not create a legally significant burden on the right recognized in Roe v. Wade. Section 3205(a)(1) does not interfere with the woman's fundamental right to decide to have an abortion. Upon review of the stipulations of the parties, I am not convinced that the doctor-only requirement will require a presentation by the physician so lengthy as to become unduly burdensome or expensive. Further, the magnitude of any cost increase is speculative at best.
Instead, the only certain impact of the doctor-only requirement is that the physician's work may become more laborious. This result, however, does not burden the woman's abortion decision. Further, as defendants point out, a statute which makes a "physician's work more laborious and less independent" does not itself violate the Constitution. Whalen v. Roe, 429 U.S. 589, 604-605 n. 33, 97 S.Ct. 869, 879 n. 33, 51 L.Ed.2d 64 (1977).
The doctor-only requirement fulfills the state's legitimate interest in the health of its citizens by insuring that the abortion decision is made after a patient-physician consultation. In Ashcroft, the Eighth Circuit upheld a provision that required the attending physician to inform the woman of the particular risks associated with the abortion technique to be used, and alternatives to abortion. The court stated that the minimal requirement was "consistent with the principle that the abortion decision is one to be made by a woman and her physician, and advances the state's interest in insuring that the decision is made with `full knowledge of its nature and consequences.'" 655 F.2d at 869, citing Planned Parenthood v. Danforth, 428 U.S. at 67, 96 S.Ct. at 2840.
For all these reasons and based on the record produced before me, I conclude that the plaintiffs have failed to show a likelihood of success on the merits of their claim that the doctor-only requirement is unconstitutional.

*799 VI. INFORMED CONSENT  SPECIFIC INFORMATION  § 3205(a)(1) & (2)
Section 3205(a)(1) requires that "except in the case of a medical emergency, consent to an abortion is voluntary and informed if and only if the woman is provided" with five pieces of information including "(i) the name of the physician who will perform the abortion; (ii) the fact that there may be detrimental physical and psychological effects which are not accurately foreseeable; (iii) the particular medical risks associated with the particular abortion procedure to be employed including, when medically accurate, the risks of infection, hemorrhage, danger to subsequent pregnancies and infertility; (iv) the probable gestational age of the unborn child at the time the abortion is to be performed; and (v) the medical risks associated with carrying her child to term."
The plaintiffs maintain that the information required to be disclosed pursuant to § 3205(a)(1) imposes a legally significant burden on the abortion decision because the rigidity it injects conflicts with the need for individualized dialogue between doctor and patient. Plaintiffs also contend that this section interferes with the physician's ability to exercise his best medical judgment in determining the needs of his or her patient and satisfying those needs. Further, plaintiffs contend that the informed consent requirements of § 3205(a)(1) exceed those imposed to secure informed consent for other surgical procedures in Pennsylvania. Plaintiffs argue that the information is intended only to skew the woman's abortion decision. The defendants, on the other hand, maintain that the informational requirements do not restrict the physician's ability to exercise his or her medical judgment or impermissibly exceed the informed consent requirements in other areas. The defendants also maintain that each of the requirements in § 3205(a)(1) is constitutionally permissible under existing decisional law.
A fundamental aspect of informed consent is that a patient be told of the options available to her. (¶ 97). In general, physicians prefer broad disclosure of risks and options but agree that the disclosure process should not be a rote recitation, either orally or in writing of the risks of a medical procedure. Instead, the physician and the patient should have a thoughtful discussion which involves great sensitivity, subtlety, and sometimes complexity about a matter of great importance to the patient. (¶ 99)
Thus, I find that consent cannot be truly informed unless the patient is given information regarding the risks inherent in the proposed procedure and the alternatives to the procedure. Women who undergo abortions are not always told of the alternatives to abortion or of the full nature and effect of the procedure they will undergo. (¶ 102) In fact, some of the women who do undergo abortions would not have had an abortion if they were provided with all the information required to be provided by the Act. (¶ 106)
Based on considerable case law which has addressed similar informational requirements necessary for informed consent, I conclude that the informational requirements of § 3205(a)(1) appear to be constitutional. In Planned Parenthood League v. Bellotti, 641 F.2d 1006 (1st Cir. 1981), the court upheld similar informational requirements concerning the type of procedure which the physician intends to use to perform the abortion, the possible complications associated with the use of the procedure and with the performance of the abortion itself, the availability of alternatives to abortion and a statement that a woman's refusal to undergo an abortion does not constitute grounds for the denial of public assistance. The court found each of these pieces of information unobjectionable and relevant to the outcome of the woman's decision.
The Bellotti court invalidated, however, a requirement that the informed consent form contain "a description of the stage of development of the unborn child." Id. In addition to Bellotti, other courts have invalidated similar fetal description provisions. Each of the cases held unconstitutional a requirement that a woman read statements concerning "organic pain to the fetus" and view material describing "probable anatomical *800 and physiological characteristics of the fetus." Similar provisions were held unconstitutional in PPA v. Ashcroft, 655 F.2d 848 (8th Cir.1981). In Ashcroft and Akron, both currently pending in the Supreme Court, the information required to be disseminated included graphic descriptions of the particular fetus.
Section 3205(a)(1)(iv) by contrast, requires a statement of "the probable gestational age of the unborn child at the time the abortion is to be performed," not a graphic description. In Women's Medical Center of Providence v. Roberts, 530 F.Supp. 1136 (D.R.I.1982), the court upheld a provision requiring that a woman know the "probable gestational age of the fetus at the time the abortion is to be performed." The court emphasized that the provision did not require discussion of anatomical and physical characteristics of the fetus but rather, concerned information routinely supplied to women seeking abortions.
I conclude that the requirements of § 3205(a)(1) are neither contrary to accepted medical practice nor an attempt to skew the woman's abortion decision. The provision does not require a physician to read any prescribed statement to the patient or require that the form be received or signed at the physician's office. Section 3205(a)(1) merely requires that the woman be provided with the information by the physician. Further, the physician remains completely free to give any additional information regarding abortion to the woman. Thus, it appears that this requirement is "consistent with the idea that the abortion decision is one to be made by a woman and her physician and advances the state's interest in insuring that the decision is made with `full knowledge of its nature and consequences.'" PPA v. Ashcroft, 655 F.2d at 869, citing Planned Parenthood v. Danforth, 428 U.S. at 67, 96 S.Ct. at 2840.
In addition, although not raised at oral argument, the plaintiffs challenge § 3205(a)(2) in their brief. Section 3205(a)(2) provides, inter alia, that the physician inform the woman (1) of her right to review printed materials describing the unborn child and (2) of agencies which offer alternatives to abortion. I conclude that these requirements appear to be contrary to the plaintiffs' argument, the provisions do not burden the woman's abortion decision, but merely inform the woman of the availability of additional detailed information of a general nature. I note that in Charles v. Carey, 627 F.2d 772 (7th Cir.1980), the Seventh Circuit held that requiring women undergoing abortions to read printed materials "pertaining to abortion and how to contact various maternal assistance agencies," did not burden the woman's abortion decision. Id. at 783. The court did, however, invalidate a provision requiring the woman to view materials produced by the state showing probable anatomical and physiological features of the fetus at various gestational ages. The court stated, in part, "The prospect of such `required reading' for the woman who elects to abort a fetus because of serious genetic defects or because her own health is in danger is punitive to the woman and compromising to the physician's efforts to do what is best for her." Id. at 784. Section 3205(a)(2)(iii), however, involves no "required reading," but merely requires that the woman be informed that she may review the materials if she so desires.
In summary, the requirements of § 3205(a) do not interfere with the woman's fundamental right to decide to have an abortion. Instead, the provisions merely achieve the legitimate state interest of insuring that the woman's decision is made with full knowledge of the nature and consequences of her decision and after consultation with her physician. For all these reasons and based upon the record produced before me, I conclude that the plaintiffs have failed to show a likelihood of success on the merits of their claim that subsections (a)(1) & (2) of § 3205 are unconstitutional.

VII. PARENTAL-JUDICIAL CONSENT  § 3206
Section 3206(a) of the Act provides that, except in the case of a medical emergency, a physician shall not perform an abortion *801 upon an unemancipated or incompetent minor without first obtaining the consent of one of the minor's parents or, in the case of an incompetent minor, the consent of her guardian. The Act specifically provides that in the event neither parent "is available to the physician within a reasonable time and in a reasonable manner, consent of any adult person standing in loco parentis shall be sufficient." 18 Pa.Con.Stat. § 3206(b). Section 3206(c) provides that if both parents of the minor refuse to consent, or if the minor prefers not to seek the consent of either parent, the minor may petition the court to authorize the abortion; the court "shall" authorize the abortion "if the court determines that the [minor] is mature and capable of giving informed consent to the proposed abortion, and has, in fact, given such consent." Finally, according to § 3206(d), if the court determines that the minor is "not mature and capable of giving informed consent," the court is nevertheless required to authorize the abortion if the abortion "would be in the best interests of the [minor]."
The plaintiffs maintain that this requirement violates the minor's fundamental right to privacy by authorizing a third-party veto of her decision to undergo an abortion and must therefore be enjoined. In addition, the plaintiffs maintain that the judicial consent provision in § 3206 would present financial, transportation and logistical problems for teenagers, resulting in time delays which will have serious health and emotional consequences for minors. Plaintiffs further claim that the section is void for vagueness. Finally, they argue that judicial approval serves no legitimate state interest since § 3204 of the Act already requires a physician to consider the age of his or her patient and determine whether in his or her best clinical judgment, the abortion is necessary.
The defendants contend, however, that the consent requirements of § 3206 comply with the most recent guidelines set by the Supreme Court regarding parental and judicial consent procedures. They maintain that the judicial approval procedures do not significantly burden the abortion decision, are not vague and express a legitimate state interest.
I conclude that the parental and judicial consent provisions of § 3206 are constitutional. I note that Justice Powell in Bellotti v. Baird, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (Bellotti II), stated guidelines that a parental consent provision should meet in order to be constitutional. I have determined that the provisions of § 3206 meet the requirements of Bellotti II.
The Bellotti II standards are set forth in Justice Powell's opinion in that case. Justice Powell's opinion which was joined in by three other justices is a thoughtful consideration of permissible state action with respect to a minor's decision to seek an abortion. Although it is not a majority opinion of the court, it is persuasive authority. I have given it careful consideration and have determined that it is sound. I conclude that the Pennsylvania Act is consistent with standards in Justice Powell's opinion in Bellotti II. I note also that since Justice White would have upheld the parental consent statute in Bellotti II which was more onerous to a minor seeking an abortion than the parental consent provision described by Justice Powell as acceptable, one could conclude that Justice White would uphold the parental-judicial consent provision of the Act.
In particular, Justice Powell wrote in Bellotti II that "if the State decides to require a pregnant minor to obtain one or both parents' consent to an abortion, it also must provide an alternative procedure whereby authorization for the abortion can be obtained." 443 U.S. at 643, 99 S.Ct. at 3048 (footnote omitted). Consequently, in Akron, the parental consent provision was held invalid, because it failed to include a judicial approval alternative to parental consent. The Commonwealth, however, has provided such an alternative procedure in § 3206(c)-(f) of the Pennsylvania Act. Furthermore, under Bellotti II the minor must be able to obtain judicial authorization for the abortion if "she is mature enough *802 and well enough informed to make her abortion decision ... independently of her parents' wishes." The Act specifically complies with this portion of Bellotti II by providing that the court "shall ... authorize a physician to perform the abortion if the court determines that the [minor] is mature and capable of giving informed consent to the proposed abortion, and has, in fact, given such consent." 18 Pa.Con.Stat. § 3206(c) (emphasis added).
Bellotti II also requires that the minor must be able to obtain authorization for the abortion under the alternative procedure "even if she is not able to make this decision independently, [but] the desired abortion would be in her best interests." 443 U.S. at 643-44, 99 S.Ct. at 3048. Again, § 3206(d) of the Act specifically provides that the court "shall" authorize the abortion "[i]f the court determines that the performance of an abortion would be in the best interests of the [minor]." Thus, § 3206 recognizes that every minor must have the opportunity, if she so desires, to go directly to a court without first consulting or notifying her parents. Further, unlike the provision at issue in Ashcroft, the court may not capriciously or arbitrarily withhold its approval. In Ashcroft, although the statute included a judicial approval alternative, the provision improperly allowed the court to withhold its consent "for any good cause," in violation of the guidelines established in Bellotti II.
Finally, under Bellotti II, the alternative procedure must "be completed with anonymity and sufficient expedition to provide an effective opportunity for an abortion to be obtained." 443 U.S. at 644, 99 S.Ct. at 3048. Section 3206(f) of the Act specifically requires that court proceedings under § 3206 be confidential and be concluded promptly. In fact, the court is required to rule on the minor's petition within three business days of the date the proceeding is initiated.
In addition, I note that in Bellotti II Justice Powell recognized that judicial approval would involve additional travel, additional financial problems, additional delay, additional emotional trauma, and any additional travel, financial problems, delay or emotional trauma which arise because of § 3206. I conclude, in agreement with Bellotti II that either these potential results do not create a legally significant burden on the minor's decision of whether to undergo an abortion or are overcome by the state's special interest in ensuring that minors exercise mature judgment when making "choices with potentially serious consequences." Bellotti II, 443 U.S. at 635, 99 S.Ct. at 3043.
The parental-judicial consent provision furthers a legitimate state interest in the health and welfare of its minor citizens. I recognize that "the right of parents `to control, educate, nurture and guide the actions of their minor children' is one which the state is constitutionally empowered to protect, ... [and] has been recognized ... in connection with abortion regulations..." Akron, 651 F.2d at 1205.
I note, however, that many pregnant minors do not seek parental guidance or consent because they fear their parents' reaction. (¶¶ 147, 148, 149, 152). The state may properly assume that minors do not always exercise the mature judgment of adults. Consequently, the state has an interest in ensuring that the judgment of minors is informed and rational. The parental-judicial consent provision attempts to ensure that the minor's abortion decision is mature and well-reasoned by providing for judicial approval when parental consent is not feasible.
I also conclude that the Act is not unconstitutionally vague because it fails to provide standards for determining when a minor is "mature" or "emancipated." I am satisfied that the words "emancipated" and "mature" are adequately defined by reference to existing state law on the subjects. In addition, as the Supreme Court indicated in Bellotti II, "... the peculiar nature of the abortion decision requires the opportunity for case-by-case evaluations of the maturity of pregnant minors." 443 U.S. at 643-44 n. 23, 99 S.Ct. at 3048 n. 23. Indeed, although a "State generally may resort to *803 objective ... criteria such as age limits, marital status, or membership in the Armed Forces for lifting some or all of the legal disabilities of minority," it is not required to adopt such "inevitably arbitrary" criteria. 443 U.S. at 643 n. 23, 99 S.Ct. at 3048 n. 23. (emphasis added). The exact same reasoning applies to the concept of emancipation, which is merely a shorthand description for "criteria ... for lifting some or all of the legal disabilities of minority." Id.
Thus, the parental-judicial consent provision of the Act appears to have been carefully crafted to comply with the guidelines established in Bellotti II and is not void for vagueness. Consequently, I conclude that the plaintiffs have failed to show a likelihood of success on the merits of this claim.

VIII. REPORTING REQUIREMENTS  §§ 3207(b) & 3214
Section 3207(b) requires every facility in Pennsylvania at which abortions are performed to report to the Department of Health of the Commonwealth of Pennsylvania: (1) the name and address of the facility; (2) the name and address of any parent, subsidiary or affiliated organizations, corporations or associations; and (3) the name and address of any parent, subsidiary or affiliated organizations, corporations or associations having contemporaneous commonality of ownership, beneficial interest, directorship or officership with any other facility. Section 3207(b) further requires that the reports shall be open to public inspection and copying.
The plaintiffs maintain that these reporting and disclosure requirements are designed to focus public scrutiny on facilities, and owners of facilities, that perform abortions for the purpose of pressuring and harassing them. The defendants, however, maintain that the reporting provisions do not invade the privacy of facility owners because they are not more detailed than similar provisions relating to owners of other business entities. The defendants also maintain that the occurrence of any harassment as a result of the provision is merely speculative.
I conclude that § 3207(b) imposes no legally significant burden on the abortion decision. This provision has no effect upon the woman who is seeking an abortion. It does not unduly burden health providers who perform abortions. The information required by § 3207(b) is no more detailed or intrusive than the Commonwealth requires in other areas, such as the requirements involving articles of incorporation under the Nonprofit Corporation Law, Pa.Stat.Ann. tit. 15, § 7316 or the requirements involving the formation of limited partnerships under the Uniform Limited Partnership Act, Pa.Stat.Ann. tit. 59, § 512. I note that the state has a legitimate interest in ensuring that all businesses are financially responsible and law-abiding. I conclude that the recordkeeping provisions at issue help the state in achieving this interest. Further, there is no evidence in the record which would allow me to conclude that § 3207(b) is designed to harass or pressure abortion-performing facilities and their owners or that imposition of the requirements would result in pressure or harassment. Consequently, I conclude that § 3207(b) does not impose a legally significant burden on the abortion decision, and is related to a legitimate state interest.
The plaintiffs also challenge § 3214, which requires, inter alia, that for each abortion, the doctor must file a report, including his identity, the identity of the referring physician, the name of the facility where the abortion was performed, and the woman's age, race, marital status, number of prior pregnancies and residence. Although some of the information in these reports is available for public inspection, subsection 3214(a) requires that the report form shall not identify the individual patient by name. In addition, subsection (e)(1) provides that statistical reports, prepared by the Department of Health based on the data gathered from reports filed pursuant to subsection (a), shall not lead to the disclosure of the identity of any person filing a report or about whom a report is filed. Further, subsection (e)(2) provides that before public disclosure of the reports *804 filed pursuant to subsection (a) the department shall substitute a unique identification number for the names of the physicians which appear on the report, so that the identity of the physician filing the report shall constitute a confidential record of the department.
The plaintiffs maintain that compelled extensive disclosure of this information creates a legally significant burden on a woman's right of privacy. Defendants, on the other hand, maintain that the recordkeeping requirements are not burdensome and are rationally related to the state's interest in protecting its citizens.
I note that a similar recordkeeping and reporting provision was upheld in Planned Parenthood of Missouri v. Danforth, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1975). Danforth upheld a requirement in which forms were supplied to abortion facilities and physicians, requiring compilation of data relevant to maternal health and life. The information on the forms was to be kept confidential and was to be used only for statistical purposes. The court considered the requirements permissible, because the requirements were reasonably directed to the preservation of maternal health and respected a patient's privacy and confidentiality. Although the information gathered pursuant to § 3214 is open to the public, I conclude that the requirements of confidentiality in § 3214(e) regarding the identity of both patient and physician prevent any invasion of privacy which could present a legally significant burden on the abortion decision.
In addition, recordkeeping of the kind expressed in § 3214 is related to the state's interest in protecting the health of its citizens. The information compiled, like that sought in Danforth, may be a resource that is relevant to "decisions involving medical experience and judgment." Id. at 81, 96 S.Ct. at 2846. Further, I note that the provision requiring complications to be reported will provide data on the occurrence of specific risks and allow the Commonwealth to identify those doctors and clinics whose patients have suffered an inordinate number of complications. Thus, the reporting requirement is related to the state's interest in maternal health.
Consequently, I conclude the reporting and recordkeeping requirements do not create a legally significant burden on the abortion decision, and serve a legitimate state interest. For all these reasons and based upon the record produced before me, I conclude that the plaintiffs have failed to show a likelihood of success on the merits of their claim that the reporting requirements are unconstitutional.

IX. HOSPITAL-ONLY REQUIREMENT FOR POST-FIRST TRIMESTER ABORTIONS  § 3209
Section 3209 of the Act provides that all abortions subsequent to the first trimester of pregnancy shall be performed, induced and completed in a hospital except in cases where a medical emergency exists.
Plaintiffs contend that this requirement effectively eliminates, for many women, the ability to exercise their fundamental right. The plaintiffs argue that if hospitals are unavailable to perform post-first trimester abortions, a government imposed hospitalization requirement may act as a governmental veto of a woman's decision to seek an abortion. Defendants contend that hospitalization in the second trimester promotes maternal health when all methods of second trimester abortions are considered. The risk of death caused by abortion increases with each week of delay. Thus, they maintain the hospitalization requirement is rationally related to the state's compelling interest in protecting the life and health of the women undergoing abortions in the second trimester.
Physicians are currently required by regulation to perform all post-first trimester abortions in a hospital. (¶ 178) In 1981, 48 hospitals in Pennsylvania performed post-first trimester abortions. (¶ 179) Thus, all post-first trimester abortions currently are performed in hospitals. There is no evidence that this has had a legally significant impact on any woman's right to obtain an abortion. Section 3209 would simply continue the status quo.
*805 The hospital-only requirement is reasonably related to the state's interest in maternal health during the second trimester of pregnancy. It is the professional opinion of plaintiff physicians that it is medically safe to perform dilation and evacuation (D & E) abortions on an out-patient basis. (¶ 180) However, according to current professional standards established by the American College of Obstetrics & Gynecology in its Manual of Standards for Obstetricians, Gynecological Survey 1982, D & E abortions should be performed only in an out-patient surgical facility. (¶ 174) To qualify as an outpatient surgical facility, a facility must have anesthesia capability, operating room equipment and other backup care facilities. (¶ 175) Most abortion clinics at present do not qualify as out-patient surgical facilities. (¶ 176) Hospitals do qualify. Since § 3209 does not require admission to a hospital, it is satisfied if a D & E is performed at a hospital on an out-patient basis.
In addition to a D & E, an abortion may be performed by a saline amniocentesis, prostaglodin installation, hysterectomy and hysterotomy. These involve serious surgical procedures. Plaintiffs do not suggest that any of these methods can or should be performed in any environment other than a hospital. Considering all possible second trimester abortion procedures (and the Act applies equally to all such procedures) I find that hospitalization in the second trimester promotes maternal health.
In Akron Center v. Akron, the Sixth Circuit upheld a requirement that every abortion subsequent to the end of the first trimester of pregnancy be performed in a hospital. The court concluded that the requirement furthered the compelling state interest in protection of maternal health. 651 F.2d at 1210. On similar grounds the Eighth Circuit in PPA v. Ashcroft upheld a similar requirement that all second trimester abortions be performed in a hospital. 655 F.2d at 853.
For all these reasons, I conclude that § 3209 is consistent with the state's compelling interest in maternal health during the second trimester of pregnancy. Therefore, I conclude that the plaintiffs have failed to show a likelihood of success on the merits of their claim that the hospital-only requirement is unconstitutional.

X. CRIMINAL PENALTIES  § 3210(a)
Section 3210(a) provides that
any person who intentionally, knowingly or recklessly performs or induces an abortion when the fetus is viable commits a felony of the third degree. It shall be a complete defense to any charge brought against a physician ... that he had concluded in good faith, in his best medical judgment, that the unborn child was not viable at the time the abortion was performed or induced or that the abortion was necessary to preserve maternal life or health.
Plaintiffs challenge this provision on the basis that it establishes a legislative presumption that all post-viability abortions are criminal and places upon the defendant the burden of pleading and proving innocence.
I note that state regulation of fetal life after viability was expressly permitted in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). In Roe v. Wade, the Supreme Court said that a state interested in protecting fetal life after viability "may go so far as to proscribe abortion during that period, except when it is necessary to preserve the life or health of the mother." 410 U.S. at 163-164, 93 S.Ct. at 731-32.
With respect to the language of § 3210(a), I note that although the Act provides for criminal penalties for persons who "intentionally, knowingly or recklessly" perform abortions when the fetus is viable, the Act also provides for complete defenses to any criminal charge under § 3210(a) if the physician had concluded in good faith, in his best medical judgment, either that the unborn child was not viable at the time the abortion was performed or induced or that the abortion was necessary to preserve maternal life or health.
Plaintiffs' argument that § 3210(a) is unconstitutional because it requires the *806 physician to plead and prove his innocence is clearly erroneous based upon my reading of § 3210(a) and Ashcroft. In Ashcroft the Eighth Circuit upheld the provisions of a Missouri statute which provided criminal penalties for any person who knowingly performed an abortion upon a viable unborn child:
As applied to the elements of this crime, the State would be required to provide that the physician was (1) aware he was performing an abortion; (2) aware this was a viable unborn child; and (3) aware the abortion was not necessary to preserve the life or health of the woman. When interpreted in this fashion, the statute does not impermissibly impinge on the rights of women and their physicians. It can be used to punish only those physicians who know that a fetus is viable and that the abortion is not necessary to the life and health of the woman. Such regulation is clearly permissible under Roe.

655 F.2d at 862 (emphasis in original). Similarly, § 3210(a) of the Act comes within the requirements of Roe v. Wade and Ashcroft.
I conclude, therefore, that the plaintiffs have failed to show a likelihood of success on the merits of their claim that the criminal penalties provision of the Act is unconstitutional.

XI. CHOICE OF ABORTION TECHNIQUE  § 3210(b)
Section 3210(b) provides with respect to abortions after viability that the physician must select the technique which provides "the best opportunity for the unborn child to be aborted alive unless, in the good faith judgment of the physician, that method or technique would present a significantly greater medical risk to the life or health of the pregnant woman than would another available method or technique."
Plaintiffs contend that this provision is unconstitutionally vague. I disagree. None of the concepts would be foreign to the physicians upon whom the requirements of this section fall. Physicians are called upon daily to assess probabilities and degrees of risk whenever there are two or more procedures from which they can chose to treat a patient. Section 3210(b) requires no more than the usual exercise of medical judgment.
I am also unpersuaded that an ambiguity exists between the terms born alive and viable which would lead physicians to use the mandated technique at an early stage of pregnancy. The caption of this section of the Act is "Abortion after viability." The provisions of this section clearly are only intended to apply after viability and not at the earlier stages hypothesized by the plaintiffs.
Plaintiffs also contend that this provision violates the substantive law enunciated in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). The plaintiffs interpret the word "significantly" in the phrase "significantly greater risk" as being a comparative term, indicative of degree. Thus, plaintiffs argue that this section requires a woman in the third trimester of pregnancy to accept some additional risk so long as it is not significant. The plaintiffs contend that this is inconsistent with Roe v. Wade which held that an abortion could not be prohibited even in the third trimester if necessary to preserve the health or life of the woman.
The court in Ashcroft upheld a provision similar to § 3210(b). The Ashcroft court stated:
If the risk to the woman from the `fetal survival method' is greater than the risk to her from alternative methods, the physician may choose an alternative. Implicitly, if the risk to the woman from the fetal survival method is less than or equal to the risk to her from available alternative methods, the physician must use the fetal survival method. Given the precision of this balance, the question is not whether the statute is vague, but whether the woman's constitutional rights are violated by a requirement that a fetal survival method must be used whenever the risks to the woman with that method are less than or equal to the risk from other possible methods.
. . . . .

*807 By definition, if the risk is absolutely equal, the life and health of the mother are subjected to no greater risk by requiring use of the fetal survival method. By requiring use of such a method when the risks from it are less than or equal to the risk of alternatives, Missouri is within permissible bounds of regulation.
655 F.2d at 863 (footnotes omitted). The provision in Ashcroft, however, required the choice of a technique most likely to preserve the life of the fetus only when risk to the woman was no greater than the risk from another technique. Plaintiffs distinguish Ashcroft contending that the Pennsylvania Act requires women to accept a slightly higher risk or somewhat higher risk while the statute in Ashcroft imposed no greater risk.
If "significantly greater risk" means that some additional risk must be accepted by the woman, I might be persuaded that the right recognized in Roe has been violated. After viability, Roe v. Wade permits a state to prohibit abortion except those abortions necessary to preserve the life or health of the woman. Thus, after viability, Roe v. Wade recognizes a class of abortions, those necessary to preserve the woman's life or health that are still entitled to a degree of protection. If § 3210(b) does impose some additional risk, as plaintiffs contend, then it burdens this group of post-viability abortions which are entitled to some degree of protection as well as those post-viability abortions which the state could prohibit completely.
The plaintiffs' error is in their interpretation of the word "significantly" as used in § 3210(b). I am obliged to give the statute that reasonable interpretation which avoids the danger of constitutional invalidity. United States v. Harriss, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954); Planned Parenthood Association v. Ashcroft, 483 F.Supp. 679, 684 (W.D.Mo.1980). I conclude that the phrase "significantly greater risk," reasonably interpreted, is not distinguishable from the statutory language in Ashcroft.
The reasonable interpretation of the term "significantly greater risk" which is consistent with constitutionality is that it is not a statement of degree of risk. Significant can be understood to mean measurable or worthy of consideration in contrast with insignificant, or not measurable or not worthy of consideration. Websters' Third New International Dictionary defines significant as "having meaning," "having or likely to have influence or effect," and "probably caused by something other than chance." When significant is defined in this way, the term "significantly greater risk" means any meaningful risk or any risk which would influence the exercise of medical judgment. Thus, the Act requires that after viability, the physician select the technique most likely to result in the live abortion of the viable fetus so long as there is no additional risk to the woman. So interpreted, the statute is constitutional for the reasons stated by the court in Ashcroft. For all these reasons and based on the record produced before me, I conclude that the plaintiffs have failed to show a likelihood of success on the merits of their claim that the choice of technique provision in § 3210(b) is unconstitutional.

XII. SECOND-DOCTOR REQUIREMENT  § 3210(c)
Section 3210(c) provides, in pertinent part, that "[a]ny person who intends to perform an abortion the method chosen for which, in his good faith judgment, does not preclude the possibility of the child surviving the abortion, shall arrange for the attendance, in the same room in which the abortion is to be completed, of a second physician."
Plaintiffs maintain that the second-doctor requirement will increase the cost and decrease the availability of some abortions. Plaintiffs also maintain that the provision is void for vagueness, in that it fails to give physicians the guidance necessary to enable them to conform their conduct to law. Additionally, plaintiffs maintain that § 3210(c) is overbroad, in that it requires the presence of a second physician any time there is even a slight chance of a live birth. Consequently, *808 plaintiffs assert that the requirement imposes a legally significant burden on a fundamental right and can be sustained only if it is necessary to further a compelling state interest.
The defendants, on the other hand, maintain that any increase in the cost of abortion procedures as a result of the second-doctor requirement does not constitute a legally significant burden on the abortion decision. They further argue that § 3210(c) gives physicians fair notice as to when a second physician must be present and is narrowly drawn to apply only where a child may survive the abortion procedure.
I conclude that § 3210(c) is not vague or overbroad. The language "the possibility of the child surviving the abortion," is sufficiently precise to afford the physicians guidance as to when a second physician is required. Section 3210(c) is distinguishable from a provision found objectionable in the Ashcroft case. Ashcroft invalidated a provision requiring a second physician to be present at the abortion of a viable unborn child to provide immediate care for the child. Ashcroft found the act overbroad, because it required a second physician even when the abortion was performed by means of the dilation and evacuation method, which method precludes survival of a viable fetus.
Section 3210(c), however, requires a second physician only when there is a possibility of the child surviving the abortion. Thus, a second physician would not be required where the means used to perform the abortion precludes survival by a viable fetus. Section 3210(c), therefore, overcomes the overbreadth objection in Ashcroft.
There is no evidence that if this provision would cause the cost of an abortion to increase or that the increase would be so substantial that it would affect a woman's exercise of her right.
In addition, because the requirement applies only when there is a possibility that the child would survive the abortion, a compelling state interest in the life of a viable fetus justifies some additional cost which might result from the presence of the second doctor.
Consequently, I conclude that § 3210(c) is reasonably related to a compelling state interest and is not vague or overly broad.
Therefore, for all these reasons and based upon the record produced before me, I conclude that the plaintiffs have failed to show a likelihood of success on the merits of their claim that the second-doctor requirement is unconstitutional.

XIII. INSURANCE COVERAGE FOR ABORTIONS  § 3215(e)
Section 3215(e) states that all insurers who make available health care and disability insurance policies in this Commonwealth shall make available policies which contain an express exclusion of coverage for abortion services not necessary to avert the death of the woman or to terminate pregnancies caused by rape or incest as well as policies containing comprehensive abortion coverage. The policies containing limited coverage must carry a premium which is lower than that which is contained in policies offering additional abortion coverage.
Plaintiffs challenge this section alleging that it requires higher premiums for policies containing comprehensive abortion coverage than for policies which contain only limited abortion coverage. Plaintiffs argue that the section is a departure from the current law of Pennsylvania which mandates actuarial soundness in insurance rates. Defendants argue that the Act bears a rational relationship to the legitimate governmental interest of encouraging childbirth over abortion.
There are a number of factors which will influence the cost to the insurer of providing the two different kinds of abortion coverage. Such factors include the social, economic and religious characteristics of the population from which the insurer typically obtains its policyholders, the type of abortion technique typically used, the relative cost of maternity benefits as compared with abortions, the number of pregnancies in the population which are carried to full term, *809 and the manner in which the coverage is sold. (¶ 190)
The parties have stipulated that the cost to an insurer of providing a health insurance policy which covers abortion only in cases of threatened maternal death, rape or incest may be either higher or lower than the cost to the insurer of providing a health insurance policy which covers abortion comprehensively. (¶ 189) This stipulation does not satisfy the plaintiffs' burden.
There is no evidence that the cost of health insurance offering only limited abortion coverage would actually be higher than comprehensive abortion coverage. There is no evidence that the state is arbitrarily requiring plaintiffs purchasing comprehensive abortion coverage to pay more or to pay a cost unrelated to the service they are being provided. There is no evidence that offering limited abortion coverage at less than comprehensive coverage will increase the cost of comprehensive coverage beyond what comprehensive coverage cost before the new Act. Even if there were an increased financial cost, there is no evidence that it would not be justified by an increased risk of claims.
Plaintiffs have failed to demonstrate that § 3215(e) is a legally significant burden on a woman's privacy right to seek an abortion. The limitation of insurance coverage does not itself affect the abortion decision or its effectuation. Insurance coverage merely affects the source of payment. Full abortion coverage still may be purchased. Even assuming that increased insurance cost could constitute a legally significant burden, there is no evidence in this record that § 3215(e) will require purchasers of comprehensive coverage to pay more after the Act than they paid before the Act.
Section 3215(e) is rationally related to the public policy of the Commonwealth encouraging childbirth over abortion. In Maher v. Roe, 432 U.S. 464, 474, 97 S.Ct. 2376, 2382, 53 L.Ed.2d 484 (1977), the Supreme Court held that a state may pass laws and regulations to further a state policy favoring childbirth over abortion where the state's action does not unduly burden the woman's right of privacy. Requiring insurers to offer a lower-priced policy containing an only limited coverage for abortion services is rationally related to the state policy favoring childbirth. It ensures that opponents of abortion will not be required to purchase coverage which they would not desire to use. It is consistent with the state policy favoring childbirth to provide this choice of coverage to the Commonwealth citizen.
Therefore based upon the record produced before me, I conclude that the plaintiffs have failed to show a likelihood of success on the merits of their claim that the insurance coverage provision is unconstitutional.

XIV. OSTEOPATHS  § 3203
Section 3203 defines "physician," as "any person licensed to practice medicine in this Commonwealth." The plaintiffs challenge this definition as depriving osteopaths of equal protection of the law. They maintain that this definition conflicts with the definition of "physician" in 1 Pa.Con.Stat.Ann. § 1991, defining physician as "an individual licensed under the laws of this Commonwealth to engage in the practice of medicine and surgery ..., or in the practice of osteopathy or osteopathic surgery." The plaintiffs note that state law dictates that when two definitions are different and irreconcilable, the "statute latest in date of final enactment shall prevail." Id. § 1936. Since the Pennsylvania Abortion Control Act makes no reference to those who are licensed to practice osteopathy, plaintiffs argue that the Act must be construed to apply only to medical doctors. Such exclusion of osteopaths, plaintiffs maintain, is arbitrary and irrational and violative of the Equal Protection Clause.
In analyzing plaintiffs' challenge, I note that a statute should be construed, if possible, to pretermit constitutional objections. See United States v. Clark, 445 U.S. 23, 100 S.Ct. 895, 63 L.Ed.2d 171 (1980), 2A Sands, Sutherland Statutory Construction § 45.11 (1973). Further, Pennsylvania law provides that, in determining legislative intent, it is presumed that the General Assembly intended that its acts be construed as consistent with the United States Constitution. 1 Pa.Con.Stat. § 1922(3).
*810 Regarding the specific language of the Act, I note that the term "medicine" is not defined in the Act. The Statutory Construction Act, however, provides that "medicine and surgery" unless otherwise provided by law, is "[t]he art and science having for their object the cure of diseases of and the preservation of the health of man, including all practice of the healing art with or without drugs." Id. § 1991. I find that osteopaths are trained in a manner which qualifies them, upon proper licensing, to cure disease and perform such acts as are necessary to preserve and protect health. (¶ 2, Affidavit Nos. 3, 6) Further, I note that the definition of "medicine and surgery" contained in the Statutory Construction Act is virtually identical to the definition of "osteopathic medicine and surgery" contained in the Osteopathic Medical Practice Act. See Pa.Stat.Ann. tit. 63, § 271.2.
In addition, I note that the legislature refers in the Act to the State Board of Medical Education and Licensure, which regulates medical doctors only. This reference does not affect the constitutionality of the Act, however. The General Assembly may have intended to modify the Board's powers. Alternatively, it may be necessary for the legislature to clarify its intent with regard to the enforcement mechanism. Nevertheless, the reference to enforcement by a body with authority over only one group of physicians does not lead to a conclusion that only the regulated group may perform abortions. The reference to the State Board of Medical Education and Licensure, therefore, does not render osteopaths unable to perform abortions.
Thus, based on the present record, it appears that osteopaths were intended by the legislature to be included within the definition of "physician."
Therefore, I conclude that the plaintiffs have failed to show a likelihood of success on the merits of their claim that the Act is unconstitutional because § 3203 does not specifically mention osteopaths.

XV. OTHER PROVISIONS  ACT AS A WHOLE
Plaintiffs challenge other provisions in their brief which were not addressed at oral argument. Plaintiffs also present in their brief challenges to the Act as a whole which were not argued. I shall address briefly each of these arguments.
Plaintiffs contend that the definition of "abortion" contained in § 3203 of the Act is void for vagueness. I find that this contention lacks merit because it misconstrues the Act's definition of abortion and ignores the decisional law which has developed in this area of law. I have considered the cases cited by the parties, and for the reasons stated in defendant's brief at 16-24, I find that the definition of "abortion" in the Act is sufficient to give those affected by its terms notice of the conduct which is prohibited.
Plaintiffs attack §§ 3202(d) and 3213(d) of the Act on the grounds that they violate the religious freedom guaranteed by the first amendment. I conclude that this argument is without merit. The claim does no more than state an establishment clause challenge which has been rejected by the courts. Merely because a statute has an underlying purpose which coincides with the tenets of a particular religion does not mean that the statute violates the establishment clause. While the law generally provides accommodations for religious objections to medical care, no portion of the Act compels that particular medical care be provided. These sections which state that persons who, as a matter of conscience, refuse to participate in abortions may not be penalized for that refusal merely implement the constitutional protection of the free exercise clause. The Act does not discriminate among religions simply because it takes measures, within the state's power, to regulate the practice of abortion.
In addition to challenging sections of the Act individually, plaintiffs argue that the Act is unconstitutional in its entirety. They contend that this is true because it imposes regulations on abortion *811 procedures which are not imposed on other surgical procedures. In making this argument, plaintiffs ignore both specific precedent permitting regulation of abortion procedures and the historic power of the state to regulate the medical and other professions in the interest of public health. I find plaintiffs' argument to be without merit. It ignores both the special nature of abortion and the decisional law in this area.
For all these reasons, for the reasons stated by the defendants in their memorandum of law, and based upon the record produced before me, I conclude that the plaintiffs have failed to show a likelihood of success on the merits of their claims that the Act as whole, and §§ 3203, 3202(d), and 3213(d) of the Act are unconstitutional.

XVI. CONCLUSION
I have applied the traditional criteria applicable to a motion for preliminary injunction: likelihood of success on the merits, irreparable harm if the relief is not granted, possibility of harm to the non-moving party, and where relevant, harm to the public. Given the importance of the right involved in this litigation, I have assumed that if the plaintiffs were able to show likelihood of success on the merits, then the irreparable harm requirement would be met. I conclude that in only one instance, the 24-hour waiting period, did the plaintiffs carry their burden of demonstrating likelihood of success on the merits.
With respect to each separate issue, I have considered the rights of the non-moving party. Where the plaintiffs failed to demonstrate likelihood of success on the merits, respect for the democratic process which the defendants serve and which produced the Act was a strong, additional factor in favor of denying plaintiffs' motion. Where plaintiffs demonstrated likelihood of success on the merits, the rights of the non-moving party were overcome by the possibility of irreparable harm to a fundamental constitutional right. In addition to the rights of the non-moving party, I have considered the public interest. Since the public has an interest in respect both for fundamental individual rights and for the legislative process, public interest favored a resolution consistent with my decision on the likelihood of success.
My adjudication is limited to the plaintiffs' request for a preliminary injunction. It is circumscribed by the record produced by the parties and the arguments advanced in the briefs on this motion. After applying the criteria for a preliminary injunction, I conclude that the only portion of the Act which the plaintiffs have demonstrated should be preliminarily enjoined is the 24-hour waiting period. In all other respects, the plaintiffs have failed to show a right to a preliminary injunction pending the outcome of the trial on the merits.
NOTES
[1] The parties' stipulation is cited throughout simply by paragraph symbol (¶) and number. The stipulation was entered into solely for the purpose of the motion for preliminary injunction. My adjudication is likewise limited.