# SUPREME COURT OF THE UNITED STATES

### JEFF SILVESTER, ET AL. *v.* XAVIER BECERRA, ATTORNEY GENERAL OF CALIFORNIA

#### ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 17–342.   Decided February 20, 2018

The petition for a writ of certiorari is denied.

JUSTICE THOMAS, dissenting from the denial of certiorari.

The Second Amendment protects "the right of the people to keep and bear Arms," and the Fourteenth Amendment requires the States to respect that right, *McDonald* v. *Chicago*, 561 U. S. 742, 749–750 (2010) (plurality opinion); *id.*, at 805 (THOMAS, J., concurring in part and concurring in judgment). Because the right to keep and bear arms is enumerated in the Constitution, courts cannot subject laws that burden it to mere rational-basis review. *District of Columbia* v. *Heller*, 554 U. S. 570, 628, n. 27 (2008).

But the decision below did just that. Purporting to apply intermediate scrutiny, the Court of Appeals upheld California's 10-day waiting period for firearms based solely on its own "common sense." *Silvester* v. *Harris*, 843 F. 3d 816, 828 (CA9 2016). It did so without requiring California to submit relevant evidence, without addressing petitioners' arguments to the contrary, and without acknowledging the District Court's factual findings. This deferential analysis was indistinguishable from rational-basis review. And it is symptomatic of the lower courts' general failure to afford the Second Amendment the respect due an enumerated constitutional right.

If a lower court treated another right so cavalierly, I have little doubt that this Court would intervene. But as evidenced by our continued inaction in this area, the Second Amendment is a disfavored right in this Court.

Because I do not believe we should be in the business of choosing which constitutional rights are "*really worth* insisting upon," *Heller, supra*, at 634, I would have granted certiorari in this case.

I

When the average person wants to buy a firearm in California, he must wait 10 days before the seller can give it to him. Cal. Penal Code Ann. §§26815 (West 2012), 27540 (West Cum. Supp. 2018). This 10-day waiting period applies to all types of firearms. But it has exceptions for certain purchasers, including peace officers, §26950 (West 2012), and special permit holders, §26965.

California's waiting period is the second longest in the country. Besides California, only eight States and the District of Columbia have any kind of waiting period. Four of those jurisdictions have waiting periods for all firearms.[1] The other five have waiting periods for only certain types of firearms.[2] Previous versions of California's waiting period likewise were limited to handguns.[3]

California enacted its current waiting period for two reasons. First, the waiting period gives state authorities time to run a background check. In addition to the back-

——————

[1] See Haw. Rev. Stat. Ann. §134–2(e) (2016 Cum. Supp.) (14 days); Ill. Comp. Stat., ch. 720, §5/24–3(A)(g) (West 2016) (3 days for handguns, 1 day for long guns); R. I. Gen. Laws §§11–47–35(a)(1) (2016 Supp.), 11–47–35.1 (2012), 11–47–35.2 (7 days); D. C. Code Ann. §22–4508 (Cum. Supp. 2017) (10 days).

[2] See Fla. Stat. §790.0655 (2017) (3 days for handguns); Iowa Code Ann. §724.20 (West Cum. Supp. 2017) (3 days for handguns); Md. Pub. Saf. Code Ann. §§5–123 (2011), 5–124, 5–101(r) (Supp. 2017) (7 days for handguns and "assault weapons"); Minn. Stat. §624.7132 (2016) (5 business days for handguns and "semiautomatic military-style assault weapon[s]"); N. J. Stat. Ann. §2C:58–2(a)(5)(a) (West 2016) (7 days for handguns).

[3] See 1975 Cal. Stats. ch. 997 (15 days); 1965 Cal. Stats. ch. 1007 (5 days); 1955 Cal. Stats. chs. 1521–1522 (3 days); 1923 Cal. Stats. ch. 339, §10 (1 day).

ground check required by federal law, 18 U. S. C. §922(t), California requires its own background check, searching at least six databases to confirm a purchaser's identity, gun ownership, legal history, and mental health. One of those databases, the Automated Firearms System (AFS), collects reports to help determine who possesses a given gun at a given time. Second, California's waiting period creates a "cooling off" period. The 10-day window gives individuals who might use a firearm to harm themselves or others an opportunity to calm down.

Petitioners Jeff Silvester and Brandon Combs are lawful gun owners who live in California. They, along with two nonprofits, filed a lawsuit challenging the constitutionality of California's waiting period under the Second Amendment. Specifically, petitioners allege that the waiting period is unconstitutional as applied to "subsequent purchasers"—individuals who already own a firearm according to California's AFS database and individuals who have a valid concealed-carry license.

A

After a 3-day bench trial, the District Court entered judgment for petitioners. *Silvester* v. *Harris*, 41 F. Supp. 3d 927, 934–935 (ED Cal. 2014). Applying intermediate scrutiny, the District Court concluded that California's waiting period was not reasonably tailored to promote an important governmental interest. Regarding background checks, the District Court found that 20 percent of background checks are auto-approved and take less than two hours to complete. *Id.,* at 964. The other 80 percent take longer, *id.,* at 954, but petitioners did not challenge the background checks or the time it takes to complete them. *Id.,* at 968, and n. 38.

That left the cooling-off period. After reviewing California's studies on the relationship between waiting periods and gun casualties, the District Court found them incon-

clusive. See *id.,* at 954–955. The District Court also noted that the studies "seem to assume that the individual does not already possess a firearm." *Id.*, at 966. California submitted "no evidence" about subsequent purchasers, which was significant because a waiting period "will not deter an individual from committing impulsive acts of violence with a separate firearm that is already in his or her possession." *Id.,* at 965–966. Even if some cooling-off period is necessary, California made no "attempt to defend a 10-day waiting period," and the background-check process will "naturally" create "a waiting period of at least 1-day" for 80 percent of purchasers. *Ibid.* The District Court also found that individuals who meet California's requirements for a concealed-carry license are uniquely "unlikely" to "engage in impulsive acts of violence." *Id.,* at 969.

California argued that a waiting period could still work for subsequent purchasers in some circumstances, but the District Court rejected this argument as overly speculative. While a subsequent purchaser's firearm could be lost, stolen, or broken, California submitted "no evidence . . . to quantify" how often this occurs. *Id.,* at 966. And state authorities could always check the AFS database to determine whether a subsequent purchaser still had a firearm—a reliable method that law enforcement officers use in the field. *Id.,* at 966–967. Further, California did not prove that waiting periods deter subsequent purchasers who want to buy a larger capacity gun. California's expert identified only one anecdotal example of a subsequent purchaser who had committed an act of gun violence, and the expert conceded that a waiting period would not have deterred that individual. *Id.,* at 966, n. 35.

B

The Court of Appeals for the Ninth Circuit reversed. 843 F. 3d, at 829. The Ninth Circuit spent most of its

opinion summarizing the background of this litigation, circuit precedent on the Second Amendment, and this Court's decision in *Heller* (including the dissent). See 843 F. 3d, at 819–826. The Ninth Circuit then concluded that "the test for intermediate scrutiny from First Amendment cases" applies to California's waiting period. *Id.,* at 821; see *id.,* at 826–827. Stressing that this test is "not a strict one," the Ninth Circuit held that California's law prevents gun violence by creating a cooling-off period. *Id.,* at 827. Although California's studies did not isolate the effect of waiting periods on subsequent purchasers, those studies "confirm the common sense understanding" that cooling-off periods deter violence and self-harm—an understanding that "is no less true" for subsequent purchasers. *Id.,* at 828.

The assumption that subsequent purchasers would just use the gun they already own was "not warranted," the Ninth Circuit concluded. *Ibid.* While it assumed that the AFS database would accurately report whether a subsequent purchaser still owns a gun, *id.,* at 826, the Ninth Circuit noted that a subsequent purchaser "may want to purchase a larger capacity weapon that will do more damage when fired into a crowd," *id.,* at 828. That possibility was enough for the Ninth Circuit to uphold California's waiting period, since intermediate scrutiny requires "only that the regulation 'promot[e] a substantial government interest that would be achieved less effectively absent the regulation.'" *Id.,* at 829.

## II

The Second Amendment guarantees "a personal right to keep and bear arms for lawful purposes." *McDonald*, 561 U. S., at 780 (plurality opinion). This Court has not definitively resolved the standard for evaluating Second Amendment claims. *Heller* did not need to resolve it because the law there failed "any of the standards of scru-

tiny that we have applied to enumerated constitutional rights." 554 U. S., at 628. After *Heller*, the Courts of Appeals generally evaluate Second Amendment claims under intermediate scrutiny. See Miller, Text, History, and Tradition: What the Seventh Amendment Can Teach Us About the Second, 122 Yale L. J. 852, 867 (2013). Several jurists disagree with this approach, suggesting that courts should instead ask whether the challenged law complies with the text, history, and tradition of the Second Amendment. See, *e.g., Tyler* v. *Hillsdale County Sheriff's Dept.*, 837 F. 3d 678, 702–703 (CA6 2016) (en banc) (Batchelder, J., concurring in most of judgment); *Houston* v. *New Orleans*, 675 F. 3d 441, 451–452 (Elrod, J., dissenting), opinion withdrawn and superseded on reh'g, 682 F. 3d 361 (CA5 2012) (*per curiam*); *Heller* v. *District of Columbia*, 670 F. 3d 1244, 1271 (CADC 2011) (Kavanaugh, J., dissenting).[4]

Although *Heller* did not definitively resolve the standard for evaluating Second Amendment claims, it rejected two proposed standards. The Court first rejected a "freestanding 'interest-balancing' approach," which would have weighed a law's burdens on Second Amendment rights against the governmental interests it promotes. 554 U. S., at 634. "The very enumeration of the [Second Amendment] right," *Heller* explained, eliminates courts' power "to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Ibid.* The Court also rejected "rational-basis scrutiny." *Id.,* at 628, n. 27. *Heller* found it "[o]bviou[s]" that rational-basis review "could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right." *Ibid.* Otherwise, the Second Amendment "would be redundant with the separate con-

---

[4] I, too, have questioned this Court's tiers-of-scrutiny jurisprudence. See *Whole Woman's Health* v. *Hellerstedt*, 579 U. S. ___, ___–___ (2016) (dissenting opinion) (slip op., at 11–16).

stitutional prohibitions on irrational laws, and would have no effect." *Ibid.*

Rational-basis review is meaningfully different from other standards for evaluating constitutional rights, including the intermediate-scrutiny standard that the Ninth Circuit invoked here. While rational-basis review allows the government to justify a law with "rational speculation unsupported by evidence or empirical data," *FCC* v. *Beach Communications, Inc.*, 508 U. S. 307, 315 (1993), intermediate scrutiny requires the government to "demonstrate that the harms it recites are real" beyond "mere speculation or conjecture," *Edenfield* v. *Fane*, 507 U. S. 761, 770–771 (1993). And while rational-basis review requires only that a law be "rational . . . at a class-based level," *Kimel* v. *Florida Bd. of Regents*, 528 U. S. 62, 86 (2000), intermediate scrutiny requires a "'reasonable fit'" between the law's ends and means, *Cincinnati* v. *Discovery Network, Inc.*, 507 U. S. 410, 416 (1993).

The Ninth Circuit claimed to be applying intermediate scrutiny, but its analysis did not resemble anything approaching that standard. It allowed California to prove a governmental interest with speculation instead of evidence. It did not meaningfully assess whether the 10-day waiting period is reasonably tailored to California's purported interest. And it did not defer to the factual findings that the District Court made after trial. The Ninth Circuit would not have done this for any other constitutional right, and it could not have done this unless it was applying rational-basis review.

A

The Ninth Circuit allowed California to justify its waiting period with mere "rational speculation unsupported by evidence or empirical data," *Beach Communications*, *supra*, at 315. The court rejected petitioners' as-applied challenge based solely on its "common sense understand-

ing" that the studies about cooling-off periods apply to subsequent purchasers. 843 F. 3d, at 828. To be sure, a law can satisfy heightened scrutiny based on "[a] long history, a substantial consensus, and simple common sense." *Burson* v. *Freeman*, 504 U. S. 191, 211 (1992) (plurality opinion). But not one of those bases was present here. The District Court found that waiting periods do not have a long historical pedigree. 41 F. Supp. 3d, at 963. It found no consensus among States that waiting periods are needed and no consensus among experts that they deter gun violence. *Id.,* at 954–955, 963. And even assuming the effectiveness of cooling-off periods is a question of "common sense," instead of statistics, the Ninth Circuit's reasoning was the opposite of common sense. Common sense suggests that subsequent purchasers contemplating violence or self-harm would use the gun they already own, instead of taking all the steps to legally buy a new one in California.[5]

The Ninth Circuit's only response to this point was that a subsequent purchaser might want a "larger capacity weapon that will do more damage when fired into a crowd." 843 F. 3d, at 828. But California presented no evidence to substantiate this concern. According to the District Court, California's expert identified one anecdotal example of a subsequent purchaser who committed an act of gun violence, but then conceded that a waiting period would have done nothing to deter that individual. 41 F. Supp. 3d, at 966, n. 35. And the Ninth Circuit did not

—————

[5] In fact, the Ninth Circuit's "common sense" conclusion was a logical fallacy. Studies suggesting that waiting periods decrease firearm casualties for *all* purchasers do not suggest that waiting periods decrease firearm casualties for *subsequent* purchasers; the observed decrease could be attributable solely to first-time purchasers. By assuming that a conclusion about the whole applies to each of its parts, the Ninth Circuit committed the "fallacy of division." See P. Hurley, A Concise Introduction to Logic 170–172 (6th ed. 1997).

even address the District Court's finding that individuals who satisfy the requirements for a concealed-carry license are uniquely unlikely to engage in such behavior. *Id.,* at 969. Needless to say, a State that offers "*no* evidence or anecdotes in support of [a] restriction" should not prevail under intermediate scrutiny. *Florida Bar* v. *Went For It, Inc.*, 515 U. S. 618, 628 (1995).

B

Even if California had presented more than "speculation or conjecture" to substantiate its concern about high-capacity weapons, *Edenfield, supra*, at 770, the Ninth Circuit did not explain why the 10-day waiting period is "sufficiently tailored to [this] goal," *Rubin* v. *Coors Brewing Co.*, 514 U. S. 476, 490 (1995). And there are many reasons to doubt that it is. California's waiting period is not limited to high-capacity weapons. Cf. *Discovery Network, supra*, at 417, n. 13 (courts should evaluate "less-burdensome alternatives" under intermediate scrutiny). And its waiting period already has exceptions for peace officers and special permit holders—individuals who, like subsequent purchasers, have a demonstrated history of responsible firearm ownership. Cf. *Greater New Orleans Broadcasting Assn., Inc.* v. *United States*, 527 U. S. 173, 190 (1999) (courts should evaluate "exemptions and inconsistencies" under intermediate scrutiny). The District Court also found that California presented no evidence supporting a 10-day waiting period. 41 F. Supp. 3d, at 966. For much of its history, California's waiting period was shorter and applied only to handguns. *Id.,* at 963. And the District Court found that a 1-day waiting period is inevitable for most purchasers because their background checks are not autoapproved. *Id.,* at 965–966.

The Ninth Circuit did not address these obvious mismatches between the ends and means of California's waiting period. It instead dismissed any tailoring concerns by

observing that intermediate scrutiny requires "only that the regulation 'promote a substantial government interest that would be achieved less effectively absent the regulation.'" 843 F. 3d, at 829.[6] But that observation was incomplete. Intermediate scrutiny also requires that a law not "burden substantially more [protected activity] than is necessary to further [the government's] interest." *Turner Broadcasting System, Inc.* v. *FCC*, 520 U. S. 180, 214 (1997) (internal quotation marks omitted). The Ninth Circuit did not ask this second question—a question that is, of course, irrelevant to a court applying rational-basis review, see *Kimel*, 528 U. S., at 85–86.

### C

Lastly, the Ninth Circuit ignored several ordinary principles of appellate review. While rational-basis review "is not subject to courtroom factfinding," *Beach Communications*, 508 U. S., at 315, intermediate scrutiny is. And here, the District Court presided over a 3-day trial and made several findings of fact. The Ninth Circuit was supposed to review those findings for clear error. See Fed. Rule Civ. Proc. 52(a)(6). Yet the Ninth Circuit barely mentioned them. And it never explained why it had the "definite and firm conviction" that they were wrong. *United States* v. *United States Gypsum Co.*, 333 U. S. 364, 395 (1948).

California contends that the District Court did not make the kind of "historical or adjudicative" findings that warrant deference. Brief in Opposition 9. But the Federal Rules do not "exclude certain categories of factual findings from the obligation of a court of appeals to accept a district

───────────

[6] The Ninth Circuit also cited its decision in *Jackson* v. *City and County of San Francisco*, 746 F. 3d 953 (2014)—another case where it applied an overly lenient standard to reject a Second Amendment claim, see 576 U. S. ___ (2015) (THOMAS, J., dissenting from denial of certiorari).

court's findings unless clearly erroneous." *Pullman-Standard* v. *Swint*, 456 U. S. 273, 287 (1982). A court of appeals must defer to a district court's factual findings, even when the findings "do not rest on credibility determinations, but are based instead on physical or documentary evidence." *Anderson* v. *Bessemer City*, 470 U. S. 564, 574 (1985). In fact, deference is "[p]articularly" appropriate when the issues require familiarity with "principles not usually contained in the general storehouse of knowledge and experience." *Graver Tank & Mfg. Co.* v. *Linde Air Products Co.*, 339 U. S. 605, 610 (1950). And "no broader review is authorized here simply because this is a constitutional case, or because the factual findings at issue may determine the outcome of the case." *Maine* v. *Taylor*, 477 U. S. 131, 145 (1986).

## III

The Ninth Circuit's deviation from ordinary principles of law is unfortunate, though not surprising. Its dismissive treatment of petitioners' challenge is emblematic of a larger trend. As I have previously explained, the lower courts are resisting this Court's decisions in *Heller* and *McDonald* and are failing to protect the Second Amendment to the same extent that they protect other constitutional rights. See *Friedman* v. *Highland Park*, 577 U. S. \_\_\_, \_\_\_ (2015) (THOMAS, J., dissenting from denial of certiorari) (slip op., at 1); *Jackson* v. *City and County of San Francisco*, 576 U. S. \_\_\_, \_\_\_ (2015) (THOMAS, J., dissenting from denial of certiorari) (slip op., at 1).

This double standard is apparent from other cases where the Ninth Circuit applies heightened scrutiny. The Ninth Circuit invalidated an Arizona law, for example, partly because it "delayed" women seeking an abortion. *Planned Parenthood Arizona, Inc.* v. *Humble*, 753 F. 3d 905, 917 (2014). The court found it important there, but not here, that the State "presented no evidence whatso-

ever that the law furthers [its] interest" and "no evidence
that [its alleged danger] exists or has ever [occurred]." *Id.,*
at 914–915. Similarly, the Ninth Circuit struck down a
county's 5-day waiting period for nude-dancing licenses
because it "unreasonably prevent[ed] a dancer from exer-
cising first amendment rights while an application [was]
pending." *Kev, Inc.* v. *Kitsap County*, 793 F. 2d 1053, 1060
(1986). The Ninth Circuit found it dispositive there, but
not here, that the county "failed to demonstrate a need for
[the] five-day delay period." *Ibid.* In another case, the
Ninth Circuit held that laws embracing traditional mar-
riage failed heightened scrutiny because the States pre-
sented "no evidence" other than "speculation and conclu-
sory assertions" to support them. *Latta* v. *Otter*, 771 F. 3d
456, 476 (2014). While those laws reflected the wisdom of
"thousands of years of human history in every society
known to have populated the planet," *Obergefell* v. *Hodges*,
576 U. S. ___, ___ (2015) (ROBERTS, C. J., dissenting) (slip
op., at 25), they faced a much tougher time in the Ninth
Circuit than California's new and unusual waiting period
for firearms. In the Ninth Circuit, it seems, rights that
have no basis in the Constitution receive greater protec-
tion than the Second Amendment, which is enumerated in
the text.

Our continued refusal to hear Second Amendment cases
only enables this kind of defiance. We have not heard
argument in a Second Amendment case for nearly eight
years. *Peruta* v. *California*, 582 U. S. ___, ___ (2017)
(THOMAS, J., dissenting from denial of certiorari) (slip op.,
at 7). And we have not clarified the standard for assessing
Second Amendment claims for almost 10. Meanwhile, in
this Term alone, we have granted review in at least five
cases involving the First Amendment and four cases in-
volving the Fourth Amendment—even though our juris-
prudence is much more developed for those rights.

If this case involved one of the Court's more favored

rights, I sincerely doubt we would have denied certiorari. I suspect that four Members of this Court would vote to review a 10-day waiting period for abortions, notwithstanding a State's purported interest in creating a "cooling off" period. Cf. *Akron Center for Reproductive Health, Inc.* v. *Akron*, 651 F. 2d 1198, 1208 (CA6 1981) (invalidating a 24-hour waiting period for abortions that was meant to create a "'cooling off period'"), aff'd in relevant part, 462 U. S. 416, 450 (1983); *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833, 887 (1992) (joint opinion of O'Connor, KENNEDY, and Souter, JJ.) (disavowing *Akron* but upholding a 24-hour waiting period only "on the record before us, and in the context of this facial challenge"). I also suspect that four Members of this Court would vote to review a 10-day waiting period on the publication of racist speech, notwithstanding a State's purported interest in giving the speaker time to calm down. Cf. *Forsyth County* v. *Nationalist Movement*, 505 U. S. 123 (1992) (holding that the First Amendment forbids a county from charging even a small permitting fee to offset the costs of providing security for a white-nationalist rally); *Virginia* v. *Black*, 538 U. S. 343 (2003) (holding that the First Amendment protects the burning of a 25-foot cross at a Ku Klux Klan rally); *Brandenburg* v. *Ohio*, 395 U. S. 444, 446, n. 1 (1969) (*per curiam*) (holding that the First Amendment protects a film featuring Klan members wielding firearms, burning a cross, and chanting "'Bury the niggers'"). Similarly, four Members of this Court would vote to review even a 10-*minute* delay of a traffic stop. Cf. *Rodriguez* v. *United States*, 575 U. S. \_\_\_ (2015) (holding that the Fourth Amendment prohibits the police from delaying a traffic stop seven or eight minutes to conduct a dog sniff). The Court would take these cases because abortion, speech, and the Fourth Amendment are three of its favored rights. The right to keep and bear arms is apparently this Court's constitutional orphan. And the lower courts seem to have

gotten the message.

\*     \*     \*

Nearly eight years ago, this Court declared that the Second Amendment is not a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald*, 561 U. S., at 780 (plurality opinion). By refusing to review decisions like the one below, we undermine that declaration. Because I still believe that the Second Amendment cannot be "singled out for special—and specially unfavorable—treatment," *id.*, at 778–779 (majority opinion), I respectfully dissent from the denial of certiorari.